In re SENIOR LIVING PROPERTIES, L.L.C., et al., Debtors.

Dan B. Lain, Trustee of Senior Living Properties, L.L.C., Trust, Plaintiff and Counter–Defendant,

v.

ZC Specialty Insurance Company, Defendant and Counter–Plaintiff.

Bankruptcy No. 02–34243–SAF–11. Adversary No. 03–3262.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

April 23, 2004.

**228**

Marvin Isgur, Floyd, Isgur, Rios and Wahrlich, Houston, David Hill, Wellborn, Houston, et al., Henderson, TX, David Marks, The Marks Firm, Houston, TX, Lynette Warman, Jenkens & Gilchrist, Dallas, TX, for Plaintiff and Counter–Defendant.

Ronald Betman, Jack Crowe, Monika Blacha, Winston & Strawn, Chicago, IL, for Defendant and Counter–Plaintiff.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Chief Judge.

In this adversary proceeding, Dan B. Lain, the Trustee of the Senior Living Properties L.L.C. (SLP) Trust, requests that the court declare that ZC Specialty Insurance Company (Zurich) was a partner with SLP in the ownership and operation of nursing homes in Illinois and Texas and that, as a partner, Zurich is liable for all of SLP's debts. Zurich responds that it merely provided a surety bond for the payment of a substantial portion of SLP's mortgage and, as a result, merely held a creditor-debtor relationship with SLP.

The trust was established pursuant to the Third Amended Joint Plan of Reorganization of SLP, confirmed by order entered August 8, 2003, with Lain appointed as the trustee. Under the plan, Lain "shall act as the representative of the [bankruptcy] Estates for the purposes of liquidating assets of the Trust." Third Am. Joint Plan of Reorganization, Art. VII, § 7.1. SLP's partnership claim against Zurich vested in the trust. *Id.; see also id.* at Art. I, definition of "alter ego claims." The plan charges Lain with the duty to collect unpaid debts of SLP from, among other entities, any partner. From the liquidation of the assets transferred to the trust, the plan directs Lain to satisfy claims in classes 6, 7, 8, 9, 10 and 11, making distributions to the extent possible. *Id.* at Art. VII, § 7.2. Those classes include SLP's unpaid unsecured vendors, service providers and personal injury claimants.

Both Lain and Zurich focus on the contractual relationship between the parties. They both agree that a Reimbursement Agreement between SLP and Zurich, and related contractual documents, inform the court's decision of whether SLP and Zurich entered a de facto partnership. GMAC Commercial Mortgage Corporation (GMAC) loaned SLP $226 million, for which SLP mortgaged its property. Zurich's surety bond guaranteed the payment of $146 million of the mortgage. SLP defaulted on its mortgage. Pursuant to the surety bond, Zurich has been dutifully paying the GMAC note since the default. Under the Reimbursement Agreement, Zurich has a claim against SLP for those payments. Lain's complaint derives from

the provisions of the Reimbursement Agreement.

Indeed, had the parties adhered to the Reimbursement Agreement, Lain's constituency would not include SLP's general unsecured trade creditors and personal injury claimants. SLP and Zurich agreed in the Reimbursement Agreement that SLP would pay its operating expenses from its monthly gross receipts before the payment of any other obligations. The vendors and service providers would have been paid. Liability insurance would have been purchased. Personal injury claimants would have been compensated by that insurance coverage.

The contractual undertaking by SLP and Zurich to pay operating expenses as a first priority tempers the partnership analysis. The law derives from the expectations of a reasonable person of how the marketplace works. *See* Posner, *Cardozo: A Study in Reputation* (University of Chicago Press 1990), at 30–31, 93–94; Kaufman, *Cardozo* (Harvard University Press 1998), at 358–59. By providing a surety bond guaranteeing the payment of SLP's mortgage, Zurich created a credit-enhanced structured financial arrangement to induce the market to provide capital for the purchase and operations of SLP's 87 nursing homes. The arrangement included a contract requiring the payment of operating expenses and insurance before payment of debt service. That arrangement assured the marketplace that vendors, service providers and patients would be protected by receiving the first distributions from gross revenues. A reasonable person would expect that a mortgage plus a surety bond issued with that contractual obligation would result in the payment of operating expenses. A reasonable person would expect that the law governing the market for that type of transaction would enforce that reasonable expectation. By invoking the legal standards for a de facto partnership, Lain seeks nothing more than to hold Zurich to that contractual obligation.

*Evidentiary Issues*

The court first addresses the evidentiary issues raised by the parties.

Zurich moves to bar consideration of evidence of nursing home injuries. Lain stipulated that he would not present such evidence. The court grants the motion.

Zurich moves to exclude parol and/or extrinsic evidence. The court addresses that motion in the findings of fact and conclusions of law below. Based on those findings and conclusions, the court grants the motion in part and denies the motion in part.

Zurich moves to exclude the use of electronic mail evidence. Except where the declarant testified at trial, the court has not considered the content of an e-mail for the truth of the matter asserted, but the court does consider an e-mail as evidence of the fact of the communication. Therefore, the court grants the motion in part and denies the motion in part.

Zurich moves to exclude and/or limit the testimony of expert witnesses Lawrence Ribstein, Neil Cohen, John Dolan, Richard Clark Abbott and W. Clifford Atherton. Lain elected not to offer Ribstein as an expert witness and withdrew his expert report. The court held, at trial, that it would not consider legal opinions from Cohen or Dolan as expert evidence. The court recognized Cohen as an expert on loan agreements and the study of surety markets and surety practice, but not on below investment grade credit markets. The court recognized Dolan as an expert on loan and reimbursement agreements and fee structures within those agreements but not in the area of pricing premi-

ums for surety bonds. Neither had expertise in dealing with credit enhancement of below investment grade debt. The court recognized Abbott as an expert in capital markets, corporate finance, workout lending, including in the healthcare field, and the review of letters of credit in a loan committee. The court did not recognize Abbott as an expert in the pricing of or the use of letters of credit or surety bonds to credit enhance below-investment grade debt. Atherton did not testify. Based on this record, the court grants the motion to exclude and limit in part and denies the motion in part.

Lain moves to strike Zurich's expert witnesses. At trial, the court recognized James Hass as an expert on mezzanine loan and surety bond pricing. At trial, the court recognized Donald Thomas, a certified public accountant, as an expert on corporate finance, credit underwriting processes, and workouts and restructuring of distressed financial transactions, including in bankruptcy cases. Within the realm of corporate finance, Thomas was not an expert on particular questions of surety bond issues. Zurich identified Allan Vestal as an expert witness but did not call him at trial. Based on this record, the court grants the motion in part and denies the motion in part.

At the beginning of the trial, the court applied Fed.R.Evid. 615, Exclusion of Witnesses. The court directed counsel for the parties to explain the rule to their witnesses. Robert Aicher, an attorney, represented Zurich in the SLP transactions. Zurich listed Aicher as a fact witness and indeed called him to testify at trial. Prior to his testimony, Zurich's trial attorneys provided Aicher with a copy of the daily transcript of the trial. The transcript included the testimony of other parties to the transaction, the principal players and an attorney who negotiated the transac-

tion. Aicher read the transcripts prior to his testimony. Aicher conceded that he violated the rule. Zurich's attorneys conceded that they provided Aicher with the transcripts, with full knowledge of the rule. Lain moved to strike Aicher's testimony. The court granted the motion.

Zurich then moved the court to reconsider its decision to strike Aicher's testimony. By order entered January 26, 2004, the court denied the motion, reserving a statement of the reasons for the denial for this memorandum decision. However, for purposes of assuring a reviewable record in the event of an appeal, the court directed the parties to designate and submit a transcript of the portions of Aicher's deposition covering his anticipated testimony.

■■■ The court has discretion to determine whether Rule 615 had been violated and, if so, what sanction, if any, should be imposed. *United States v. Berry,* 670 F.2d 583, 606 (5th Cir.1982). A violation of the rule does not automatically bar the testimony of the errant witness. Rather, in the exercise of discretion, the court must assess all the circumstances, including prejudice to the parties. Providing a witness the daily copy of the trial transcript constitutes a violation of Rule 615. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1373 (5th Cir.1981). Aicher, a lawyer, knowingly violated the rule. Zurich's lawyers knowingly aided the violation of the rule. The witness represented Zurich and its parent and affiliated entities in negotiating the SLP transaction. The witness's testimony would have concerned central, substantive issues in the case regarding those negotiations and the transaction itself. The witness read the transcript of other principal players in the transaction, including opposing counsel in the negotiations. The witness read the transcript of the testimony of his clients'

employees regarding their role in the transaction. By doing so, the witness undermined the very purpose of the rule. *Id.* That, in turn, prejudiced Lain. The sanction is reasonable for the violation. *Id.* By striking the testimony, Zurich could and did still present its case, including the testimony of six key Zurich or Zurich-related figures in the transaction.

Lain objects to the admission of several of Zurich's exhibits. Lain objects to exhibit 1000, the valuation counselors' appraisal reports of the Texas and Illinois nursing homes. The parties presented testimony addressing GMAC's valuation of the properties, but the parties did not discuss the appraisal reports themselves. Because the appraisal reports had not been provided in discovery, the court sustains the objection.

The objection to page no. 22683 of exhibit 1020 is moot as the page was not submitted to the court. The court sustains the objections to 1041, 1042, 1045, 1046, 1047, 1048, 1067, 1068, 1072, 1073, 1074, 1086, 1102, 1136, 1137, 1144, 1147 (incomplete), 1158, 1166 (court cannot determine the role of the declarant), 1170, 1179 (preparer of document unknown), 1185, 1195, 1202 and 1209 (hearsay within hearsay without declarant testifying), 1204, 1212, 1228 and 1229.

The court overrules the objections to 1060 as the exhibit is part of the underlying bankruptcy case record. The court overrules the hearsay objections to 1069, 1081, 1082 (exhibit admitted at trial on December 16, 2003), 1085, 1105, 1117, 1119, 1123, 1124, 1127, 1130, 1133, 1162, 1164 (GMAC personnel testified), 1182 (GMAC personnel testified), 1186, 1187, 1191, 1193, 1196, 1203 (GMAC personnel testified), 1213, 1214 (except for the attachment, which is not admitted as author is unknown), and 1219. Regarding these exhibits, either the declarant testified at trial or the party who sponsored or prepared the exhibit or the attachment to the exhibit testified at trial. Concerning the purpose for offering the exhibits, the trustworthiness of each of the exhibits could, therefore, be tested at trial.

The court has disregarded the handwritten notes on exhibit 1117. Lain contends that several exhibits contain expert opinions. The court overrules that objection; the exhibits contain opinions of the parties involved in the transaction. The court overrules objections to unsigned letters where the declarant or a representative of the declarant testified at trial and the exhibit is not marked as a draft. Based on the testimony of Peter Licari, the president and chief executive officer of CCS, the court sustains the objection to exhibit 1194 because the document was not released. The court overrules the objection to exhibit 1218 and admits it for the purpose of showing the filing of the motion in the underlying bankruptcy case.

The ruling on the objections to exhibits 1220, 1221, 1223 and 1225 are subsumed by the court's adjudication of Lain's motion to exclude experts.

Zurich objects to the admission of most of Lain's exhibits. At trial, the court admitted the exhibits subject to consideration of the objections as part of the court's findings and conclusions. The court overrules the objections to Lain's exhibits 1, 4, 5, 11, 12, 17, 20, 21, 23, 24, 27, 28, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 45, 46, 47, 50, 53, 57, 78, 85, 110, 112, 113, 115, 117, 124, 125, 126, 127, 128, 129, 131, 132, 136A, 142, 145, 154, 155, 156, 161, 163, 164, 165, 170, 171, 172, 173, 174, 175 and 176. Regarding these exhibits, either the declarant testified at trial or the party who sponsored or prepared the exhibit or the attachment to the exhibit testified at trial. Concerning the purpose for offering the exhibits, the trustworthiness of each of the

exhibits could, therefore, be tested at trial. The court considers exhibits 94 and 103 as evidence of communications. The court's ruling on Zurich's motion to strike e-mails addresses the extent of the court's consideration of e-mail exhibits.

The court overrules the objection to Lain's exhibits 6 and 119 as the exhibits do not purport to be an agreement but a negotiation exchange. The court sustains the objection to exhibits 2, 3, 7 and 9. The court overrules the objection to exhibit 8 because the court admitted as an exhibit the complete Reimbursement Agreement. The court overrules the objections to Lain's exhibit 10. The exhibit is probative.

The court sustains the objections to exhibits 15, 18 and 48. The objections concern the handwritten portion of the exhibits, which the court does not consider. The court overrules the objection to the handwritten portions of exhibit 25 as the primary persons identified testified. The court does not consider the handwritten portions of exhibits 93, 128, 129, 132, 155, 165, 170 and 173. The court overrules all other objections to handwritten portions of exhibits. The court overrules the objection to exhibits 26 and 29, in part. The court considers the exhibits as communication between Zurich and Heller. The court overrules the objection to exhibit 31 except the court does not consider the mistakenly attached copy of another exhibit. The court overrules the objection to exhibits 41 and 70 as the complete documents have either been tendered or admitted. The court overrules the objection to exhibit 42 as the exhibit is not admitted to prove the truth of the matter asserted. The court sustains the objections to exhibits 49, 58, 59, 63, 65, 81, 82, 83, 84, 86, 87, 88, 89, 90, 91, 92, 95, 96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 116, 118, 123, 147, 151, 152, 159 and 169. The court overrules the relevancy objection to exhibits 160, 165

and 173. The rulings on the objections to exhibits 177 through 187 are subsumed by the court's adjudication of Zurich's motion to exclude experts. The court overrules the work product objection to several e-mails. The court overrules the prejudicial effect objections. The court overrules all other objections, including those objections to 52, 56, 61, 62, 79, 111, 114, 119, 143, 148, 149 and 150.

Zurich moves to strike the expert opinion of Larry E. Ribstein and his supplemental expert report. Lain opposes the motion. During the trial Lain withdrew Ribstein's expert report and announced that he would not offer Ribstein as an expert witness. Lain did not provide Zurich with a supplemental expert report from Ribstein either prior to trial or before the close of evidence at trial. The court recognized during the trial that to the extent professors, like Ribstein, provided Lain with "treatises or papers or arguments," Lain could use them in his arguments to the court. The court stated, "If you have a treatise, if you have a paper, if you have a commentary or he wants to spoon-feed you a legal argument, I'll consider legal arguments." Trial Tr., Dec. 18, 2003 at 34. Lain attached Ribstein's withdrawn expert report and a supplemental report to his post-trial brief. That circumvents the withdrawal of the report and the court's comments. The court recognized that treatises and similarly published scholarly work, such as papers and commentaries by law professors such as Ribstein, could be cited by Lain as part of his arguments to the court. Instead of citing scholarly published papers, Lain has attempted to present Ribstein's expert report after it had been withdrawn. That cannot be permitted. The court grants Zurich's motion to strike.

Zurich moves to strike Lain's deposition designations never introduced into the rec-

ord. Zurich limits its motion to deposition excerpts not exchanged between counsel or not introduced during the trial. The court grants the motion, except if excerpts of the deposition were presented in court without objection, the court considers any objection waived.

Zurich moves to limit Lain's presentation of rebuttal evidence. Lain presented evidence during his case in chief to support his case and Zurich's anticipated defenses. Lain presented appropriate evidence in rebuttal to Zurich's evidence. The court denies the motion to limit rebuttal evidence.

### Partnership Law

■ The parties disagree on the applicable non-bankruptcy law. Lain asserts that the court should apply Texas law; Zurich asserts that the court should apply Illinois law. The Reimbursement Agreement, dated February 6, 1998, states: "This agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to Illinois choice of law principles." Reimbursement Agreement, § 9.06(a). The adjudication of this adversary proceeding turns on the construction of the Reimbursement Agreement. The contractual choice of law provision in the agreement controls. *In re Consol. Capital Equities Corp.,* 143 B.R. 80, 84 (Bankr.N.D.Tex. 1992).

A Texas court would honor the contractual choice of law provision. *Exxon Corp. v. Burglin,* 4 F.3d 1294, 1298 (5th Cir.1993). The contract bears a reasonable relationship to Illinois. *Id.* at n. 5. SLP operated nursing homes in Illinois and in Texas. A greater percentage of the operations were in Texas. A majority of the face amount of personal injury claims against SLP derive from the Texas nursing homes. SLP had more vendors from Texas than from any other state. Zurich incorporated in Texas, as a Texas-licensed insurer. Thus, the parties had a relationship with Texas, but that relationship does not defeat the parties' choice of Illinois law, given the relationship with Illinois as well. The court notes that SLP is an Indiana limited liability company with its principal place of business in Wyoming. SLP and Zurich negotiated, drafted and executed the contract in Maryland.

Application of Illinois law does not violate a fundamental public policy of Texas. *Id.* The partnership law of Illinois and Texas derives from the Uniform Partnership Act. *King v. Evans,* 791 S.W.2d 531, 535 (Tex.App.—San Antonio 1990) ("The legislature derived Texas partnership law almost verbatim from the Uniform Partnership Act (UPA) which originated with the National Conference of Commissioners on Uniform State Laws."); *Peskin v. Deutsch,* 134 Ill.App.3d 48, 89 Ill.Dec. 28, 479 N.E.2d 1034, 1037 (1 Dist.1985) ("The Uniform Partnership Act has long been in effect in Illinois . . . .") Illinois and Texas apply similar canons for the construction of contracts. In the event this court should conduct an independent choice of law assessment, Lain presents no compelling reason to deviate from SLP's and Zurich's choice of Illinois law to construe the contract. *See In re Prof'l Investors Ins. Group, Inc.,* 232 B.R. 870, 884 (Bankr. N.D.Tex.1999) (court examines equities and contacts of the transaction and the parties).

The court applies Illinois law.

Lain contends that SLP and Zurich entered their de facto partnership through a series of transactions beginning in December 1997 and culminating in the execution of the Reimbursement Agreement and other documents on February 6, 1998. The Illinois Uniform Partnership Act, codified at 805 Ill. Comp. Stat. 205/1 et seq. (2003), applies to the transaction. *Id.* at 205/90(a).

The Illinois Uniform Partnership Act defines a "partnership" as "an association of two or more persons to carry on as co-owners a business for profit and includes for all purposes of the laws of this State, a registered limited liability partnership." *Id.* at 205/6(1).

"In determining whether a partnership exists, these rules shall apply: ... the sharing of gross returns does not of itself establish a partnership...." *Id.* at 205/7(3). However:

> (4) The receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business, but no such inference shall be drawn if such profits were received in payment: (a) As a debt by installments or otherwise; (b) As wages ...; (c) As an annuity ...; (d) As interest on a loan, though the amount of payment vary with the profits of the business; (e) As the consideration for the sale of the good-will of a business or other property by installments or otherwise.

*Id.* at 205/7(4).

In a partnership, "[e]very partner is an agent of the partnership for the purpose of its business...." *Id.* at 205/9(1). An act of a partner with apparent authority for carrying on in the usual way the business of the partnership binds the partnership. *Id.* With several exceptions, "all partners are liable ... jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract." *Id.* at 205/15(a)(2). Except as provided in 205/15, each partner must contribute towards the losses sustained by the partnership according to his share of the profits. *Id.* at 205/18(a).

A partner who contributes to the partnership beyond his agreed capital contribution shall be paid interest on the payment or advance. *Id.* at 205/18(c). All partners have equal rights in the management and conduct of the partnership business. *Id.* at 205/18(e).

Every partner is entitled to access to the partnership's books and records, and may inspect and copy them. *Id.* at 205/19. Partners must render on demand true and full information of all things affecting the partnership to any partner. *Id.* at 205/20. Any partner has the right to a formal account of the partnership affairs. *Id.* at 205/22.

Lain has the burden of proving that Zurich was a partner in SLP's business. *Barratt v. Implementation Specialists for Healthcare, Inc.*, No. 99–C–3514, 1999 WL 967513, at *1 (N.D.Ill. Oct. 6, 1999).

> The existence of a partnership must be clearly shown, but that question is one of the intention of the parties, to be gathered from an examination of the facts and circumstances of their dealings.... A partnership exists when: (1) parties join together to carry on a venture for their common benefit, (2) each party contributes property or services to the venture, and (3) each party has a community of interest in the profits of the venture.... The Illinois Supreme Court has noted that whether the alleged partners share profits is the essential test.... Courts also examine a number of other factors, including: the manner in which the parties have dealt with each other; the mode in which each has, with the knowledge of the other, dealt with persons in a partnership capacity; [and] whether they have filed with the county clerk a certificate setting forth the name of the partnership.

*Id.* Illinois courts also consider whether partnership tax returns have been filed, *Chen v. Wang*, No. 96–C–0681, 1998 WL 27140, at *8 (N.D.Ill. Jan.16, 1998), and

whether the alleged partnership has advertised using a partnership name. *Argianas v. Chestler*, 259 Ill.App.3d 926, 197 Ill.Dec. 900, 631 N.E.2d 1359, 1368 (1994).

"Additionally, an agreement to form a partnership does not itself create a partnership; the partnership does not arise until the parties actually join together to carry on a common venture, each contributing property or services and each having a community of interest in the profits." *Chen*, 1998 WL 27140 at *8.

Normally, Lain's burden of proof would be a preponderance of the evidence. *Snyder v. Dunn*, 265 Ill.App.3d 891, 202 Ill.Dec. 876, 638 N.E.2d 744, 746 (1994); *Seidmon v. Harris*, 172 Ill.App.3d 352, 122 Ill.Dec. 284, 526 N.E.2d 543, 546 (1988). "However, where the evidence contains writings of the parties that distinctly indicate a relationship other than a partnership, the assertion that a partnership exists must be based on very clear and convincing evidence." *Id.* Illinois courts have defined "clear and convincing" evidence "as the quantum of proof that leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Seidmon*, 122 Ill.Dec. 284, 526 N.E.2d at 546. Courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense. *Id.* If expressed in degrees of proof, preponderance of the evidence would equate to probably true; clear and convincing, to highly probably true; and beyond reasonable doubt, almost certainly true. *Id.*

While the parties disagree on whether Zurich became a partner in SLP's business, the parties agree that SLP purchased a surety bond from Zurich. The Reimbursement Agreement obligates SLP to pay Zurich a premium for that surety bond. In addition, in the Reimbursement Agreement, SLP agreed to reimburse Zurich for payments made by Zurich pursuant to the surety obligation. The writing of the parties therefore does contain evidence to indicate a relationship other than a partnership. As a result, the court applies the clear and convincing burden of proof.

*The Transaction*

In February 1998, Jim Eden, Allison Eden and Larry Bonds formed SLP to own and/or lease nursing homes in Texas and Illinois. Jim Eden obtained a fifty percent interest in SLP; Allison Eden, 24.99%; Bonds, 24.99%; and SLP Management, Inc., 0.01%. SLP acquired the homes in a transaction designed and negotiated by Complete Care Services, L.P. (CCS), Zurich and Zurich's parent entity. CCS, a Pennsylvania limited partnership formed in 1989, manages nursing homes. Zurich, a Texas property and casualty insurance company, is part of the Centre Group (collectively referred to as Centre). The Centre Group is a group of insurance companies that utilize their balance sheets to participate in financial transactions.

GMAC, a leading healthcare lending institution, loaned SLP $226 million to purchase the nursing homes. SLP granted a first lien mortgage to GMAC to secure the loan. GMAC would only make an investment grade loan, which it could sell on the secondary market as part of a REMIC, a real estate mortgage investment conduit. The income stream from the nursing homes would only support an investment grade loan of $80 million. Zurich agreed to provide a surety bond, guaranteeing payment of an additional $146 million. Zurich drew on its portfolio to credit-enhance the loan, making a total investment grade loan of $226 million.

James Hass, of the consulting firm of Hamilton, Rabinovitz & Alschuler, Inc., testified on behalf of Zurich on structured financial transactions. Hass has significant financing experience in both the public and private sectors. He explained that a credit enhancement device allowed a borrower to "rent" the financial rating of the enhancer to improve debt service obligations. The guarantor receives a premium for providing that service.

With Zurich's credit-enhancing surety bond, GMAC made the loan. SLP executed a promissory note dated February 6, 1998, promising to pay GMAC $226 million. The note accrued base interest of 6.81% per annum. SLP–GMAC Promissory Note, § 1.1. SLP agreed to pay principal and interest monthly, amortized over twenty-five years. *Id.* at § 2. Notwithstanding the twenty-five year amortization schedule, the note became due and payable on February 1, 2008. *Id.* at § 4. The note provides that SLP and GMAC "intend that the relationship between them shall be solely that of debtor and creditor." *Id.* at § 12.18.

In a separate loan agreement, GMAC formally conditioned funding the loan on SLP having "arranged for the issuance of the Surety Bond" in an amount satisfactory to GMAC and "intended to be sufficient to obtain a rating of 'AA' or better from the Rating Agency upon the Loan ...." SLP–GMAC Loan Agreement, § 2.4. The loan agreement set the initial amount of the surety at $125 million. *Id.* With the surety, GMAC agreed that it would extend the maturity date of the loan for up to two extension periods, not to exceed one year each. *Id.* at § 2.8. The loan agreement required that SLP maintain insurance to protect all aspects of its business operations. *Id.* at § 4.4.

In an inter-creditor agreement between GMAC and Zurich, if Zurich made a payment on the GMAC note, GMAC granted to Zurich a participation interest in the note.

Zurich and CCS negotiated a management contract, making CCS the manager of the nursing homes. They actually entered an agreement for the Texas homes and an agreement for the Illinois homes. The court interchangeably refers to the relationship in the singular and in the plural. The management contract governed all aspects of the operation of the nursing homes. CCS agreed to manage the homes for twenty years, with a fee of five percent of the gross monthly receipts, and a contingent performance fee of twenty percent of free cash flow. CCS loaned $10 million to SLP, for which SLP executed a note.

The parties formed SLP as a special purpose entity to own the homes. Bonds and Jim Eden contributed a total of $200 of capital to the enterprise. At the closing, CCS and SLP entered the management agreement. The seller of the property, known in the trial as Park Associates, agreed to discount the purchase price by taking a $10 million subordinated note at closing.

HCFP Funding, Inc. (Heller) agreed to provide working capital lines of credit, secured by SLP's accounts receivable.

SLP, Zurich, GMAC, CCS and Heller entered a trust agreement with the First National Bank of Chicago. The trustee would hold and distribute funds to the holders of obligations, including GMAC, Zurich, Heller and CCS. The parties agreed, however, to subordinate their rights to payments to persons given priority under a Reimbursement Agreement entered between SLP and Zurich.

SLP and Zurich entered the Reimbursement Agreement.

## The Reimbursement Agreement

In the Reimbursement Agreement, SLP agreed to reimburse Zurich for certain obligations, with interest. § 2.01(a)(i), 2.01(b). The obligations included payments by Zurich to GMAC under the surety bond. § 1.01, definitions, including definition of "Losses," "Reimbursement Amounts," and "Reimbursement Obligations."

The Reimbursement Agreement remains in full force and effect until the later of the expiration of Zurich's obligations to GMAC under the bond or the payment by SLP of reimbursement obligations. § 2.03. The GMAC mortgage loan, amortized over twenty-five years, was due and payable in ten years. In the Reimbursement Agreement, SLP agreed that Zurich had the right, in its sole discretion, to extend the maturity date of the note. Zurich could exercise that right "if it, in its sole judgment, concludes that at the Maturity Date . . . [SLP] will not be able to pay a Final Supplemented [sic] Performance Surety Premium satisfactory in amount to [Zurich]." § 2.05.

The Reimbursement Agreement required that SLP maintain full general liability insurance coverage, naming Zurich as a co-insured. § 6.04. SLP agreed to provide Zurich with extensive financial statements and information during the term of the GMAC loan. § 6.05. Zurich had the right to examine and inspect SLP's books and records at any reasonable time. § 6.07. SLP had to provide Zurich with at least ten business days' notice of a members meeting, providing Zurich with an opportunity to attend the meeting. § 6.22.

SLP and Zurich agreed that the CCS management agreement would be kept in full force and effect. SLP agreed to timely perform its obligations under the management agreement. SLP could not ter-minate, amend or assign the management agreement without Zurich's prior written consent, "which consent may be in the sole and absolute discretion of [Zurich]." § 6.14. The Reimbursement Agreement further provided that SLP "will not enter into any other management agreement without [Zurich's] prior written consent, which may be in the sole and absolute discretion of [Zurich]." *Id.*

The Reimbursement Agreement required that SLP maintain a capital expenditure fund and a liquidity fund. Mandated by the GMAC loan, the capital expenditure fund assured that SLP would have readily available capital to maintain and improve the conditions of the nursing homes. § 6.13. The liquidity fund assured the availability of funds to service the GMAC loan and Zurich surety premium in the event of a net cash flow shortage after payment of operating expenses. § 6.24.

The liquidity fund had two sub-accounts, designated "Performance Surety Premium Subaccount" and "70/20/10 Subaccount." § 6.24(a). Distributions to those sub-accounts turned on the use of cash flow under Article X of the agreement, addressing application of operating revenue. The parties referred to Article X as the "waterfall."

Under the waterfall, on the first business day of each month, SLP would determine its operating revenue. SLP "shall apply all such Operating Revenue, in payment of the following items, in the following order of priority . . .:" § 10.01.

First, operating expenses, which included salaries, wages, employee benefits and payroll taxes at the nursing homes, real estate and lease expenses, a base management fee to CCS, depreciation and amortization expenses, and all other operating expenses, which would include general lia-

bility insurance. § 10.01(i) and § 1.01, definitions of "Operating Revenue" and "Operating Expenses."

Second, principal and interest on the GMAC loan.

Third, other indebtedness, if any, owed to GMAC.

Fourth, reimbursement obligations to Zurich, if any incurred.

Fifth, interest, then principal, payments to Heller for working capital loan.

Sixth, payment of the Base Surety Premium for the Zurich surety bond.

Seventh, capital improvement account to cover any capital expenditures provided in SLP's operating budget.

Eighth, if applicable, an additional fee for CCS.

Ninth, on a pari passu basis, principal and interest due on the CCS note and the Additional Surety Premiums for the Zurich surety bond, but paid to the trustee administering the transaction.

Tenth, interest on the seller note.

After payment of the operating expenses, interest on indebtedness, the Base Surety Premium and the Additional Surety Premium and taxes, the Reimbursement Agreement defined remaining cash as "free cash flow." The free cash flow would be paid into the liquidity fund covered by § 6.24 of the Agreement. Pursuant to § 10.02 of the Reimbursement Agreement, the free cash flow would be distributed on a quarterly basis "in the following order of priority:"

First, the Performance Surety Premium.

Second, on the Supplemental Termination Premium Payment Date, the termination fee and the final base management fee.

Third, the Supplemental Performance Surety Premiums, Performance Management Fee and Members' Distribution, as provided in § 6.24. The Supplemental Performance Surety Premium means "an amount equal to 70%" of the remaining free cash flow available for distribution on the first business day of each month. § 1.01, definitions.

Sections 6.24 and 10.02 provided that free cash flow would be held to assure payment of the GMAC note and the Base Surety Premium and Additional Surety Premium to Zurich. Under § 10.01, those items would be paid after operating expenses had been paid. If SLP made all these payments, the free cash flow would be paid from the liquidity fund to Zurich, CCS and the SLP members in the percentages established in § 6.24.

The Reimbursement Agreement also obligated Zurich to pay CCS based on a formula to cover the loss in principal in the CCS note in the event of a voluntary sale of SLP's nursing homes prior to the end of the term of the surety bond for less than the amount necessary to pay the GMAC and CCS notes. § 10.03.

As part of the eventual windup of SLP, on the Supplemental Termination Premium Payment Date, SLP "shall pay" the Supplemental Termination Premium to the trustee. "The Final Supplemental Performance Surety Premium shall be paid pari passu with the Final Performance Management Fee" to CCS. § 10.04. The Supplemental Termination Premium Payment Date is the earlier of the GMAC note maturity date, payment of the GMAC note or the date of the disposition of substantially all of SLP's capital assets. § 101, definitions. The Supplemental Termination Premium is defined as the Termination Premium and the Final Supplemental Performance Surety Premium. *Id.* The Termination Premium is the present value of any unpaid Base Surety Premium and

Additional Surety Premium. The Final Supplemental Performance Surety Premium means seventy percent of SLP's net fair market value, unless CCS is no longer the manager, in which case, it means ninety percent. *Id.*

### Premium or Profits

 Zurich asserts that the Reimbursement Agreement, coupled with the surety bond, and read in the context of the entire transaction, establishes only a debtor-creditor relationship with SLP. Lain recognizes that a debtor-creditor relationship existed. Nevertheless, Lain contends that beyond that, but pursuant to the terms of the Reimbursement Agreement, Zurich shared in SLP's profits, making Zurich a de facto partner of SLP under Illinois law.

 The court must therefore construe the Reimbursement Agreement. Applying Illinois law, "[t]he primary objective in contract construction is to give effect to the intention of the parties and that intention is to be ascertained from the language of the contract." *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.,* 256 Ill.App.3d 31, 195 Ill.Dec. 701, 628 N.E.2d 1165, 1168 (1993). The court must interpret the contract "as a whole, giving meaning and effect to each provision thereof." *Id.*

A court must construe the meaning of a contract by examining the language and may not interpret the contract in a way contrary to the plain and obvious meaning of its terms. Unless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning. Furthermore, the court must place the meanings of words within the context of the contract as a whole.

*Dean Mgmt., Inc. v. TBS Const., Inc.,* 339 Ill.App.3d 263, 274 Ill.Dec. 161, 790 N.E.2d 934, 939 (2003). The court may not add language or matters to a contract about which the instrument is silent, "nor add words or terms to an agreement to change the plain meaning of the parties as expressed in the agreement." *Id.*

 If the language of the contract is "facially unambiguous," then the court interprets the contract as a matter of law without considering parol evidence. *Id.* at 940. "If, however, the language of the contract is susceptible to more than one meaning, then an ambiguity is present and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity." *Id.* "A contract term is ambiguous when it may reasonably be interpreted in more than one way. The mere fact that the parties disagree on some term, however, does not render the term ambiguous." *Id.* at 939.

As consideration for the credit-enhancing surety bond, Zurich charged SLP a premium. The Reimbursement Agreement does not contain a fixed dollar premium for the surety bond. Rather, the Reimbursement Agreement provides several financial obligations, which it denominates as "premiums." The court must examine the substance of those obligations, in the context of the agreement as a whole, giving meaning and effect to each provision.

In the Reimbursement Agreement, Zurich charged five "premiums": (1) A "Base Surety Premium," which was an annual premium of $2,692,041. (2) An "Additional Surety Premium," which was an annual premium of $1,383,128. (3) A "Performance Surety Premium," which was an annual fee equal to the free cash flow under the Reimbursement Agreement, but not to exceed $4 million per year. (4) A "Supplemental Performance Surety Premium," which means an amount equal to seventy percent of the remaining free cash flow on

a distribution date. (5) A "Final Supplemental Performance Surety Premium," which means seventy percent of SLP's net market value or, if CCS was not the manager on the date of determination, ninety percent. Reimbursement Agreement, § 1.01, definitions.

Under the waterfall provisions of the Reimbursement Agreement, SLP pays the Base Surety Premium after the payment of operating expenses, including the base management fees, the GMAC note and any reimbursement obligations under the surety. If operating revenue remains, SLP pays the Additional Surety Premium in pari passu with the CCS note. These are fixed dollar amounts paid from operating revenue. Applying common and generally accepted meanings and reading the provisions for the payment of the Base Surety Premium and Additional Surety Premium in context, SLP, in exchange for the surety, paid a premium from operating revenue. That is a commonly understood manner for the payment of insurance premiums. Those payment obligations, therefore, unambiguously constitute payment in exchange for the surety bond, and, as such, are premiums.

But the "Performance Surety Premium" and "Supplemental Performance Surety Premium" are paid from free cash flow. Free cash flow exists, under the Reimbursement Agreement, only after the payment of all operating expenses, funding the capital expenditure account and funding the liquidity account. Funds in the liquidity fund may only be used to pay Zurich after servicing the GMAC note and after payment of the Base Surety Premium and Additional Surety Premium. With all operating expenses paid, a reserve for capital expenditures and a reserve for mortgage service, SLP would have free cash flow to make additional payments to

Zurich. In that situation, SLP would be distributing profits.

Section 10.02 of the Reimbursement Agreement defines free cash flow available for distribution to the equity holders or owners. The waterfall provisions of § 10.01 provides for the payment of all operating expenses from operating revenues. As defined in the agreement, the operating expenses would include all salaries, wages, employee benefits, payroll taxes, real estate and other lease expenses, the base property management fee, all expenses for insurance, depreciation and amortization. The agreement then provides for payment of all loan and note obligations as they become due, including the surety bond premium and any advances made by Zurich. Having provided for free cash flow for the company under § 10.01 to operate, the agreement then refigures free cash flow for equity. Depreciation and amortization are added back. Any additional cash and any proceeds from the sale of assets is added. Deductions are made for the capital expenditure fund and for the liquidity fund, thereby addressing the company's needs for future capital improvements and debt service.

In effect, then, the Reimbursement Agreement derives net operating profit after taxes from an income statement and makes adjustments to determine cash available for distribution to the company's owners. After removing accounting adjustments for items like depreciation from the income statement, the waterfall provisions of §§ 10.01 and 10.02, as the terms are defined in the agreement, determine actual cash in and cash out, resulting in profits available to reinvest as capital or distribute to owners. The agreement defines cash flow left after payment of the operating expenses, taxes, reinvestment needs and debt service of the business. That establishes cash flow available for the

equity holders of the business. Cash flow available for distribution to equity is profits. *See* A. Damodaran, *Corporate Finance: Theory and Practice* (John Wiley & Sons, Inc.2001), at pp. 131–33 (defining and contrasting free cash flow for the firm with free cash flow for equity).

Illinois courts recognize that profits are net earnings after deduction of business expenses. *In re Marriage of Werries*, 247 Ill.App.3d 639, 186 Ill.Dec. 747, 616 N.E.2d 1379, 1388 (1993); *see also Land O'Lakes, Inc. v. Fredjo's Enters., Ltd.*, No. 88–C–0716, 1992 WL 153619, at *6 (N.D.Ill. June 24, 1992) (in analyzing a claim of damages for lost profits, court observes that Illinois courts recognize that net profits exist after subtracting the expenses of operating a business from its gross revenue). *Compare Hunssinger v. Rockford Business Credits, Inc.*, 745 F.2d 484, 490 (7th Cir. 1984) (analyzing federal securities law, the Seventh Circuit observes that profits include participation in earnings or a residual claim on an entity's assets and earnings as contrasted with a note holder who is entitled to payment of interest whether or not the obligor has current earnings and whose interest payment will not increase if the obligor has a successful year or has an expectation of profits).

From the profits, SLP pays Zurich the Performance Surety Premium in an amount not to exceed $4 million per year. Then, from remaining free cash flow, as defined, which includes accounting for the liquidity fund, SLP pays seventy percent to Zurich. That constitutes a distribution of profits.

Zurich contends that the seventy percent distribution reflects the price of the premium. That reading is not consistent with the plain meaning and common understanding of all the terms of the contract. The payment of seventy percent of free cash flow after payment of all operating expenses, funding a capital expenditure reserve, and funding a liquidity reserve for future mortgage and fixed annual surety premiums, is a distribution of profits.

The Reimbursement Agreement also provides for a "Final Supplemental Performance Surety Premium." SLP pays Zurich that obligation upon a determination of the net fair market value of SLP as a going concern. As cited above, the Reimbursement Agreement provides for the Final Supplemental Performance Surety Premium on the eventual windup of SLP. On the earlier of the GMAC maturity date, payment of the GMAC note or the date of disposition of substantially all of SLP's capital assets, SLP would pay Zurich the present value of any unpaid Base Surety Premium and Additional Surety Premium plus seventy percent of SLP's net fair market value, unless CCS was no longer managing the SLP nursing homes, in which case Zurich would receive ninety percent of SLP's net fair market value. With regard to the triggering events for the payment of the Final Supplemental Performance Surety Premium, Zurich, not SLP, had the sole discretion to negotiate an extension of the GMAC maturity date if Zurich concluded that SLP could not pay the Final Supplemental Performance Surety Premium in an amount satisfactory to Zurich. Payment of the GMAC note connotes that Zurich would not have made a payment to GMAC under the surety or, if it had, Zurich would have been reimbursed pursuant to the waterfall priorities. The Reimbursement Agreement required that SLP obtain Zurich's approval before disposing of substantially all of SLP's capital assets. Consequently, the Final Supplemental Performance Surety Premium constitutes a distribution of equity to Zurich. The court concludes that a distribution of equity subsumes the Illinois statutory concept of "a share of the profits of a busi-

ness." *See Hunssinger,* 745 F.2d at 490 (profits include a residual claim on an entity's assets and earnings).

Under Illinois law, "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business." 805 ILCS 205/7(4). The Reimbursement Agreement constitutes prima facie evidence that Zurich is a partner with SLP in SLP's business.

## Parol Evidence

Zurich maintains that the financial risks it incurred by providing the credit-enhancing surety bond compelled the "premium" structure under the Reimbursement Agreement. To consider the financial risks of the surety and the associated underwriting pricing considerations, the court would have to entertain evidence beyond the contract. To do that, the court must find the contract ambiguous.

The contract is not ambiguous. The contract provides for annual payments that constitute premiums for a surety bond and for other payments that constitute sharing profits under Illinois law. Under the "four corners" of the Reimbursement Agreement, this dichotomy is neither inconsistent nor contradictory. Rather, the reading gives meaning to each word in the contract, as defined by the parties, and gives effect to the contract as a whole.

The determination of whether a contract is ambiguous is a question of law. *Omnitrus Merging,* 195 Ill.Dec. 701, 628 N.E.2d at 1168. Consequently, a reviewing court would read the contract without applying any deference to the trial court's reading of the contract. Recognizing that a reviewing court might find the contract ambiguous, in the interest of completeness, the court considers the parol evidence regarding the construction of the contract.

## The Negotiations

In July 1997, CCS executed a letter of intent to purchase 89 nursing homes in Texas and Illinois from Park Associates. CCS retained the services of ZA Consulting to implement the transaction. Peter Licari, the president and chief executive officer of CCS, testified that by October or November 1997, CCS concluded that it could not own more nursing homes in Texas. Steven Fishman of ZA Consulting worked with Licari to find an alternative means to implement a transaction whereby CCS would manage the Park nursing homes.

Fishman testified that he looked for financing alternatives on behalf of CCS. Fishman contacted several financial institutions. Fishman called Mark Baker at Centre. Fishman testified that he explored obtaining a guaranty to support a larger bank loan for the purchase of the nursing homes with CCS involvement. Understanding that Centre expressed an interest, Fishman informed Licari of Centre.

Centre had embarked on an aggressive investment strategy. Licari with his attorney and Fishman met with Centre employees in New York on November 24, 1997. Baker, a senior vice president of Centre at the time of the transaction, told Licari that Centre had capital it desired to invest in the nursing home business. Baker said that Centre had an interest in owning nursing homes. CCS's attorney, Fred Ehmann, circulated a term sheet reflecting the conversation. Ehmann recorded that Centre would form an entity to buy the nursing homes or would control who became the owner of the nursing homes. Ehmann testified that he understood that Centre proposed that CCS would "hand off" ownership of the nursing homes to the Centre side of the negotiations. Ehmann

felt confident that financial and management arrangements would be reached between CCS and Centre. Accordingly, CCS proceeded with the purchase of the nursing homes.

On December 11, 1997, Centre provided CCS with a responsive term sheet. In that term sheet, Centre created definitions of premiums to capture free cash flow after the payment of senior debt. Licari considered that Centre proposed thereby to share in the profits of operating the nursing homes. Licari testified that Baker gave him the firm impression that Centre intended to share in the profits. Ehmann testified that after extensive conversations following the exchange of term sheets, he continued to understand that Centre intended to determine the buyer of the nursing homes. In the exchanges, Ehmann discussed with Centre the potential lender, CCS's role as manager, and the priority of payments.

Baker served on the Zurich board and, for a time, as an officer. Baker, Centre's lead underwriter on the transaction, functioned as the team leader in the SLP transaction, reporting and making recommendations to David Wasserman, Centre's chief executive officer at the time of the transaction. Baker also served as an officer of the Centre reinsurance company that underwrote the Centre risk in the transaction.

Wasserman testified that Centre took a flexible approach to financial transactions, at times taking an equity position with shares or warrants. But, mostly, Centre assumed a mezzanine position in the middle of the debt structure. Wasserman testified that he had no direct involvement in the SLP negotiations. Baker, on behalf of the underwriting department, handled the negotiations. Baker consulted with Wasserman. Wasserman held the ultimate authority at Centre to approve a transaction.

Typically, Wasserman would give informal approval before the formal closing of the transaction but often would not give formal approval until after the closing.

In December 1997, Baker, on behalf of Centre, and Fishman explored mortgage financing for the acquisition of the nursing homes. GMAC proposed a mortgage loan. Baker selected GMAC to be the lender. CCS and Centre met with GMAC on December 29, 1997.

Catherine Hilbush, GMAC's loan officer for the transaction, testified that GMAC intended to sell the loan in the secondary market as part of a REMIC. For GMAC's lending criteria, the loan to value ratio could not exceed eighty percent. GMAC obtained an appraisal of the nursing homes of $282 million. That value would support a loan of $226 million. However, to include the loan in a REMIC, the loan had to be rated as investment grade, regardless of the loan to value ratio. The nursing homes' operations, if owned by a special purpose entity, would support a loan at investment grade of $80 million. To obtain the remaining $146 million, Centre offered a surety bond as a credit enhancement. Wasserman understood that Centre would provide credit enhancement to the GMAC loan.

William Shine, who was in charge of GMAC's healthcare lending, testified that GMAC assumed it would obtain an acceptable surety bond to allow for the securitization of the loan through a REMIC. The court notes, parenthetically, albeit written in September 2000 after the closing, Hilbush, with others, wrote:

> Financing Risk: The acquisition of the facilities included no Owners Equity. The owner's motivation to continue to operate the properties in the face of difficulties may be affected by their lack of equity exposure. The surety appears to bear the ownership exposure.

Meanwhile, on December 16, 1997, CCS met with Centre at CCS's headquarters in Pennsylvania to present its business and its personnel, what Licari referred to as a "dog and pony show." Ehmann attended as CCS's attorney. Lynn Finkel and Howard Zail from Centre attended the meeting. Fishman testified that he introduced Eden and Bonds into the transaction, suggesting that they would have an independent directors' role. On December 18, 1997, Baker arranged a meeting with Licari and Eden and Bonds. Baker informed Licari that Eden and Bonds would have a directors' role.

On December 29 or 30, 1997, CCS, Centre and GMAC met at CCS's offices in Pennsylvania. The parties discussed the structure of the transaction and arranged for due diligence investigations. On December 31, 1997, Centre wrote to CCS proposing that the first $4 million of net cash flow would be paid to Centre and eighty percent of residual net cash flow would be paid to Centre; upon sale of the nursing homes, eighty percent of the net proceeds would be paid to Centre; and an unnamed "borrower" would enter a twenty-year management contract with CCS.

Ehmann testified that he understood that the eighty percent provision would daily sweep the net cash to Centre. Ehmann testified that the sweep would include profits, and would actually be a broader sweep than merely profits.

On January 17, 1998, Licari, Fishman, and Zurich's representatives began negotiating the management agreement. Baker talked about Centre being the owner of the nursing homes. Licari and Baker negotiated the terms of the management agreement, the length of the agreement, the termination-for-cause provision, the base management fee, and a management performance incentive package. Bonds testified that he felt that the management

agreement's twenty-year term was too long and the fees too rich. But neither he nor Eden were involved in the negotiations over the management agreement. Centre and CCS negotiated the agreement, presenting it to Eden and Bonds for execution. The negotiations continued until the closing of the transaction on February 6, 1998.

As found above, GMAC agreed to loan $226 million, with the availability of a credit-enhancing surety bond from Centre. GMAC intended to sell the secured note on the secondary market as part of a REMIC. Centre used Zurich for the surety. Zurich actually issued the original surety bond for $125 million, then increased it to $146 million. As part of the closing, Park Associates agreed to take a $10 million subordinated note and CCS agreed to take a $10 million subordinated note.

### Zurich's Analysis

After the closing, Zurich proposed to retain Fishman and ZA Consulting as its ongoing advisors concerning the transaction. Zurich proposed to pay ZA Consulting five percent of Zurich's profits plus out-of-pocket expense reimbursement as compensation for its consulting work. Although Zurich and ZA Consulting did not finalize this arrangement, on March 16, 1998, Baker provided Fishman with Centre's February 1998 internal assessment of the transaction.

Rich Koehler of Centre, under Baker's direction, had prepared a written analysis of the transaction, titled "Deal Memo." In the Deal Memo, prepared for Centre's formal approval of the transaction, but not dated, Koehler described that Zurich would issue a surety bond for $144.55 million to assure a GMAC $226 million loan with an "AA" rating. Centre "did not wish to own the nursing homes," so SLP was formed to own the homes. But Centre

obtained the right "to defease the entire $226 million GMAC debt financing and assume sole control of the SLP operation."

The Deal Memo states that "the annual premium for the [Zurich] surety bond is $4.075 million." The Deal Memo then describes what Zurich receives "in addition." Zurich:

> will receive an annual contingent additional premium equal to the first $4.0 million in free cash flow from the SLP operations and 70% of the free cash flow above $4.0 million. Prior to distribution of any annual contingent additional premium, a fund will be established to support operations of the homes including any required capital expenditures.

The Deal Memo reports "[Zurich's] expected profit is $54 million with a probability of loss of 19% and a maximum downside of $84 million. The return on ARC [allocated risk capital] for the transaction is 36%."

In summarizing its payments, Centre determined the annual base premium "as 100% of the difference between the cost of the debt financing prior to the [Zurich] surety bond and the cost of this portion of the financing with the [Zurich] surety bond." Centre determined that the annual additional premium would "provide [Zurich] with a 15% return on the $21.0 million 'equity portion' of the bank debt, less the cost of financing this portion of the bank debt." The performance premiums capture 100% of annual free cash flow up to $4.0 million and seventy percent thereafter, with a reserve to assure debt payment in the future.

Centre's executive officer, Wasserman, the underwriter, Baker, and the actuary, legal, tax and accounting directors, affixed their stamps of approval to the Deal Memo. Strangely, the "stamp" approvals are all dated "11/13/98" or "11/11/98," well after the closing. Wasserman testified that at times the formal approval followed

the informal assessment and authorization to proceed.

Baker provided Fishman with a February 1998 Centre report that demonstratively mirrored the Deal Memo. Centre viewed the SLP transaction as providing "An Innovative Financing Structure" for "Underperforming Nursing Homes" "with Turnaround Potential" and "an Opportunity for the Zurich Centre Group." Centre combined the resources of its accounting, financing and tax departments in developing the structure of the transaction. Centre viewed the transaction as providing an opportunity "to capture significant equity economics with no cash outlay."

Without a surety, Centre determined that the nursing home acquisitions would require a $21 million equity investment. With the surety, "[t]he $21 million that would have been equity is now part of the single loan." After providing its market assessment of the interest rates with and without a surety, Centre concluded that "[a] portion of the premium structure captures" a return to Zurich on a priority basis of the $21 million portion under the loan. Centre determined that "we capture in excess of 70% of the equity economics, 100% of the first $4MM in excess cash flow each year plus 70% of every dollar above $4MM million." Centre calculated its best and worst case scenarios for its anticipated return before considering reinsurance. It then determined the risk of the property and management performance and its cost of the undertaking by factoring for reinsurance. It concluded that its "downside exposure to [be] something in the range of $30–35MM" if it obtained reinsurance for a projected total premium over the life of the deal of less than $5 million. For that downside exposure, Centre projected a base case profit of $67 million on a net present value basis, an average profit of $75 million, with an eighty-one percent

chance of achieving that level of return, a downside maximum loss likelihood of only one percent, and an overall anticipated return of thirty-six percent.

Centre concluded:

[w]ith respect to the basis savings on the cost of borrowed funds, we captured 100% of the difference in the borrowing cost of the senior and mezzanine [sic] loans relative to a financing with no surety. (Base and Additional Premiums). In addition we receive equity returns, in excess of 70% of the economic upside of the transaction without funding a dime of the trasaction [sic]. Given that during the term we receive the 100% of first $4MM of free cash flow our % of the upside is roughly 88% in our base case.

Finkel had been responsible for Centre's due diligence analysis of the transaction. She testified that Centre figured it assumed a surety position on the level of mezzanine financing with an "equity kicker." With a Zurich surety bond, the parties could negotiate a more leveraged transaction, with a high debt to equity ratio. Finkel testified that Centre did not price the transaction to include a $21 million equity return. However, the internal Centre analysis does indeed report a $21 million equity projection. Finkel testified that the Centre analysis was not accurate. But Finkel performed oversight functions for the development of Centre's financial models. Wasserman also testified that the projection of "equity-like" returns of $21 million was not accurate. Their testimony on this point is not credible. Finkel is a sophisticated financial analyst with substantial business experience and education. Wasserman was the chief executive officer and had been involved with Centre's world-wide transactions, numbering fifty to seventy-five per year. The Centre analysis had been prepared by its accounting,

finance and tax departments and assembled and reported by its underwriters after Finkel's due diligence. The analysis was completed in February 1998 for the closing. Finkel would not loosely support an internal assessment reporting an equity position in the transaction if Centre did not indeed have that expectation. Wasserman would have corrected the assessment at the time if not accurately labeled. Instead, Wasserman ultimately affixed his approval stamp to the Deal Memo.

Baker had suggested that the transaction provided a potential upside to Centre of eighty-eight percent. Wasserman did not recall that suggestion. But Wasserman recognized that Zurich negotiated for a contractual right to seventy percent of the free cash flow after payment of operating expenses, debt service and reserves, and seventy percent of the net market value in the event of a sale. At trial, Finkel would not acknowledge that this amounted to a share of the profits. However, Baker acknowledged an average return of thirty-six percent. Yet, Baker testified that Zurich only intended to capture, through structured and partially deferred premiums, sufficient expected returns to cover its risks.

CCS, Centre and GMAC held several pre-closing meetings. Closing negotiations actually lasted from January 27, 1998, to February 6, 1998. Centre played an active role in the closing negotiations. From Licari's perspective, Baker negotiated from the position of an owner. Centre actively negotiated the management agreement, the Reimbursement Agreement, and the loan agreements. Centre with Baker and its attorney, CCS with its attorney, and Fishman negotiated the Reimbursement Agreement. Fishman mediated impasses in the negotiations. Centre had been trying to figure out how an insurance company could own nursing homes. With

the realization that Centre could not out-right own the nursing homes, Centre determined to create a special purpose entity to own the nursing homes. As the closing negotiations progressed, the idea of creating SLP emerged.

Eden testified that he had originally been approached to serve as an outside director. He formed an entity with that role in mind. He sought compensation for that role but had no interest in assuming a financial risk. Bonds testified that he learned of the deal from Eden. Bonds also understood that initially their role would be independent directors. As discussions progressed, Bonds recalled the term "nominee owner" being bandied about. Eden and Bonds did not attend the entire closing. However, as the closing process evolved, Eden and Bonds agreed to be the members of a special purpose entity to own the nursing homes. They invested $200 as capital. For that, they obtained certain tax benefits, the right to receive salaries and fees, controlled by Zurich, in exchange for services, and ten percent of the free cash flow and ultimate equity. In reaching this agreement, Bonds testified that he and Eden and their counsel negotiated with Baker, Finkel and Zail. Neither Eden nor Bonds paid closing costs. SLP's members assumed no financial risks for the operations of the nursing homes. SLP did obtain responsibility for operating licenses and compliance with state and federal regulations concerning nursing homes. But, under the management agreement, negotiated by Centre and CCS, CCS assumed responsibility to manage the homes consistent with the regulations.

*Creditor or Partner Protections*

Zurich contends that the Reimbursement Agreement merely contains the protections typically given to a secured lender. Because Zurich provided a guaranty to GMAC through the surety bond, Zurich asserts that it reasonably obtained the protections typically given to the secured lender. But under Illinois partnership law, a partner gets the same type of protections. Thus, the rest of the agreement does not negate that the agreement provides for the sharing of profits as well as the payment of a premium for the surety bond.

On February 6, 1998, the parties executed the closing documents for the transaction. In addition to the "premiums" contained in the Reimbursement Agreement, Zurich obtained several indicia of ownership. Zurich negotiated the waterfall to assure that all vendors and service providers of the nursing homes would be paid. Owners negotiate transaction documents to assure payment of vendors. Creditors negotiate transaction documents to assure payment of their debt. Baker testified that he did not consider the impact on trade creditors and patients of the lack of actual capital investment by SLP's equity holders. But, by the closing, he did not have to consider that impact. On behalf of Zurich, he negotiated the Reimbursement Agreement's waterfall that provided for the payment of the trade creditors and the purchase of patient-protective insurance before the payment of the GMAC note. If a shortfall resulted in insufficient revenue to then pay the GMAC note, Zurich contracted to pay the note. Thus, this provision is an indicia of ownership.

The waterfall provided for a liquidity fund. Reimbursement Agreement, §§ 6.24, 10.02(iii). That fund assured payment of GMAC's note and Zurich's fixed surety premiums. Under that arrangement, Zurich assured that SLP would have funds available to pay creditors, including Zurich wearing its creditor's hat, before distributing excess cash to equity level in-

terests. This provision is consistent with the acts of an owner.

The waterfall also provided for payment of SLP's reimbursement obligations before distribution of the seventy percent "premium." Under the transaction documents, payments made by Zurich on the surety bond to GMAC created a debt obligation for SLP. Payment of the debt obligation occurs before distribution of free cash flow. This provision addresses the debt obligations to Zurich while preserving the profit distribution. The contract recognizes that Zurich may wear both a creditor's hat and an owner's hat. In bankruptcy parlance, under their contractual arrangement, Zurich's claim would be paid before a distribution is made on its equity interest.

Zurich had ultimate control of the management of the nursing homes. Reimbursement Agreement, § 6.14. SLP could not terminate the CCS contract without Zurich's approval. Hilbush testified that a creditor typically included management review provisions to assure adequacy of management to protect its position as a creditor. Don Thomas agreed, as did Clark Abbott, Lain's rebuttal expert in the fields of capital markets, corporate finance, workout lending and the review of letters of credit in a committee but not in the field of pricing of letters of credit. However, the Reimbursement Agreement provides Zurich with the "sole and absolute discretion" to authorize SLP to terminate the management agreement and to execute an alternative management agreement. Zurich had final authority for the selection of a successor management company. No witness testified that a creditor obtained absolute control over employment of management. Dolan testified that he would not expect that magnitude of control in a creditor reimbursement agreement. Under Illinois law, all partners have equal rights in the management of the partnership business. 805 ILCS 205/18(e). The management provision of the Reimbursement Agreement thus recognizes the rights of a creditor to monitor but goes beyond those rights to include the power and rights of a partner.

In the event CCS suffered a loss on its $10 million note, Zurich assumed one-half of that loss. Reimbursement Agreement, § 10.03. Ehmann testified that this provision, ultimately suggested by Baker, addressed the concern of CCS and Zurich about loss sharing. Ehmann testified that, in his experience, this was a unique provision. Finkel did not recall the provision so could not comment about it in her testimony. Thomas testified that he could not ascertain what the provision meant or attempted to accomplish. Hass testified that he had never seen this type of provision in a creditor agreement. The assumption of the loss of a subordinated note is not consistent with the role of a creditor but rather reflects the interest of an owner. Indeed, as part of the agreement among the parties, in the event CCS had been terminated as the property manager, Zurich's interest in the free cash flow and ultimate distribution increased from seventy percent to ninety percent. Hass testified that he had never seen this type of reversion of a management interest to a surety in a creditor agreement.

Zurich obtained the authority to negotiate an extension of the GMAC maturity date. Reimbursement Agreement, § 2.05. Zurich could extend the GMAC maturity date if Zurich concluded that it could not obtain a Final Supplemental Performance Surety Premium in an amount satisfactory to Zurich. That premium amounted to seventy percent of SLP's fair market value, unless CCS was no longer the manager, in which case, it increased to ninety percent. In addition, Zurich had the au-

thority to control the disposition of substantially all of SLP's capital assets, Reimbursement Agreement § 7.03, which it could exercise to assure a final payment it deemed satisfactory. Bonds testified that Zurich obtained this control from SLP to maximize the realization of the seventy or ninety percent interest, to a level satisfactory to Zurich. Finkel would not or could not testify about the purpose of these provisions. Hilbush testified that § 2.05 was not a typical creditor provision in a loan document. Dolan testified that he would not expect that type of provision in a loan document. Thomas could not identify a loan transaction with a similar provision. Nor could Hass. Under Illinois law, a partner may contract to protect "his share of the profits and surplus." 805 ILCS 205/26; *see also* Part VI, dissolution and winding up at 805 ILCS 205/29–205/43. The court concludes that this provision constitutes an indicia of ownership.

Hilbush testified that several of the provisions of the Reimbursement Agreement mirrored the SLP–GMAC loan agreement or would be typical creditor protections. These include default provisions of § 4.01, several of the representations and warranties of Article V, the maintenance of existence requirement of § 6.02, the insurance requirements of § 6.04, the financial information of § 6.05, the access to and accuracy of the books and records of § 6.07, the payment of debt service of § 6.08, the debt service coverage ratios of § 6.09, the capital expenditure reserve of § 6.13, part (but only part) of the management agreement requirements of § 6.14, and several of the negative covenants of Article VII, all from the Reimbursement Agreement. Both provide for Illinois law to apply, and both have an integration clause. The Reimbursement Agreement limits compensation paid to Eden and Bonds and controls dividends without Zurich's consent. Zurich held a creditor-debtor relationship with

SLP. SLP owed Zurich for the actual premium for the surety bond itself. Also, in the event of a Zurich payment to GMAC, SLP had an obligation to repay Zurich. While these provisions addressed that creditor-debtor relationship, Illinois partnership law also accords several of these rights to a partner.

Illinois law provides that a partner is entitled to access to the partnership's books and records. 805 ILCS 205/19. Partners must render on demand true and full information of all things affecting the partnership to any partner. *Id.* at 205/20. Any partner has the right to a formal account of the partnership affairs. *Id.* at 205/22.

The Reimbursement Agreement prohibits SLP from prepaying GMAC "without the prior written consent of [Zurich]." Reimbursement Agreement, § 7.11. Thomas testified that, for this transaction, that is not an unusual provision. Dolan testified that this was not a typical creditor protection. The court infers that a guarantor would prefer that the principal debt be paid. The payment of the principal debt would relieve Zurich of its obligations under the surety bond. But, in this case, Zurich might not have obtained the equity return it sought in the transaction in the event of an early payment of the mortgage. For that reason, Zurich controlled whether SLP could prepay the loan. Zurich contends that an intent to form a partnership could not exist because the relationship between Zurich and SLP would end with the payment of the GMAC note. As found above, Zurich could extend the term of the loan, and thereby extend its relationship with SLP, for its economic benefit. Under Illinois partnership law, a partnership can be "for a fixed term." 805 ILCS 205/23. Thus, the court concludes that this provision is an indicia of ownership.

Thomas testified that the owner would typically negotiate the management contract. While SLP did not negotiate the contract, SLP signed the contract. Thomas knew that Eden and Bonds had been in the nursing home business.

Nevertheless, Thomas opined that the Reimbursement Agreement looked like a creditor agreement. To a point, it does. It contains the basic elements of a credit agreement, addressing Zurich's creditor's hat. But Thomas further testified that he could not identify another creditor transaction with the transfer of extension rights of § 2.05 of the Reimbursement Agreement. He recognized that he gave his opinion without understanding the meaning of § 10.03. He could not recall an "equity kicker" of seventy percent for a surety. Indeed, he testified that he could not identify another transaction with a creditor in a similar circumstance.

Dolan testified that several of the provisions of the Reimbursement Agreement overwhelm a creditor-debtor relationship. The agreement does not contain sufficient "distance" between Zurich and SLP to be merely a creditor-debtor agreement. Indeed, based on the above findings, Centre considered that it negotiated for and obtained an ownership interest in the nursing homes. In its internal analysis, Centre projected an equity return. Fishman testified that he discussed that analysis with Baker. Fishman understood that Centre sought an equity return because it was taking an equity risk. Baker opined that Centre should obtain a profit above the difference between the capital loan rates without the credit enhancement and with the credit enhancement. Equity would exist above that difference, which Centre would capture.

Baker testified that his goal was not to obtain ownership benefits of the nursing homes for Centre or Zurich. According to the Deal Memo, Centre determined not to "own" the nursing homes, but it did intend to obtain ownership benefits, by contracting for payments and interests "in addition" to the premium to cover the surety bond itself. Baker's testimony is not credible. Invoking Clintonesque responses, Baker evaded questions asking him to express his intent in the negotiations. Indeed, he would not even acknowledge that he actually negotiated the transaction, electing to evade the questions by asking for the meaning of "negotiate." Rather than recognize his role in the negotiations, he testified that the only persons who negotiated the management agreement with CCS were the persons who signed the agreement. Nevertheless, he reluctantly acknowledged an internal memorandum stating that Centre would receive an equity return of seventy percent of the economic upside of the transaction without funding the operations or acquisition. Centre insisted that, in the event CCS ceased managing the nursing homes, Zurich would obtain CCS's twenty percent interest in free cash flow under the Reimbursement Agreement and in the distributions after a sale of the assets. Baker testified that by controlling that interest, it could provide an incentive to a successor manager. With the right to ninety percent of the free cash flow and the equity in the business, Zurich held the position of the owner. Zurich could offer a successor managing company a share of the free cash flow and equity or retain that interest for itself.

Although Baker hesitated about several internal Centre documents, he ultimately recognized that Centre referred to the transaction as "an innovative financing structure" and "equity return shared." Baker testified that he and others at Centre used these terms too loosely. The Centre personnel involved in the transac-

tion were experienced, sophisticated players in the financial markets, with graduate level business degrees. They would not use words of market significance loosely. Centre negotiated for the realization of the economic upside of any success in operating the nursing homes. An internal Centre memorandum reflected that Zurich would realize that value by surety premiums which capture "savings from reduced borrowing cost of loan,...annual excess cash flow generated during the life of the transaction, and...residual economic value at end of the term."

Finkel testified that the Reimbursement Agreement only contemplated Zurich's role as providing a surety bond. Zurich would pay the GMAC principal and interest, with SLP having an obligation to repay Zurich. Zurich thereby provided an insurance policy to SLP to cover the mortgage. But if SLP only purchased a surety bond from Zurich, the obligations to pay Zurich a premium should have ended with the payment of the GMAC debt. Both the GMAC debt and the surety bond had ten-year terms. At the maturity of the GMAC loan or the repayment of the GMAC debt, SLP's obligations under the Reimbursement Agreement did not end. Zurich had a contractual right to seventy or ninety percent of the net fair market value of SLP as a going concern. At the time of the maturity of the GMAC loan, Zurich had the exclusive right to negotiate an extension of the maturity date. Finkel acknowledged that Zurich had an interest in SLP after the GMAC note's maturity date or after the payment of the GMAC note until Zurich obtained that return. Nevertheless, Finkel insisted that neither Centre nor Zurich intended for Zurich to have an ownership position with SLP. That testimony is not credible.

After the closing, Zurich considered that it had an ownership position. Centre personnel, including Finkel, referred to actions concerning CCS as manager as "we would like" and "we supervise, they execute." They referred to GMAC as "our choice." They referred to the nursing homes as "our" nursing homes. They referred to regional managers of the nursing homes as "our" regional managers. They referenced the seventy percent obligation as "70% profits." Finkel confirmed that under § 10.02 of the Reimbursement Agreement, Zurich obtained the last seventy or ninety percent of cash distribution after payment of operating expenses, debt service and reserves, depending on whether CCS remained the property manager. She also confirmed that under § 10.04, Zurich obtained the last seventy percent or ninety percent of a sale. Baker and Finkel recognized an internal base case analysis with an eighty-eight percent "upside" for Zurich. By putting Centre's balance sheet to work to enhance credit, Finkel testified that Centre entered the negotiations with the intention of attempting to obtain an ownership interest without an asset appearing on Centre's balance sheet. Centre's internal assessment referred to capturing "equity economics" and "equity returns." The "equity returns" were "in addition" to premiums to cover the borrowing cost differences. The Centre personnel were too sophisticated in financial affairs and Centre's operations not to mean what they said to each other.

*Pricing*

Wasserman testified that Centre would price the surety based on the risks that GMAC would call the guaranty. To compensate Centre for that risk, Centre negotiated a compensation package, with different components, some up front, some at the back end of the transaction. With the supplemental performance premium, Zurich agreed to be compensated if the nursing homes produced income. Wasserman

could not identify another transaction where Centre obtained seventy percent of the net free cash flow, after payment of operating expenses, as the price of an insurance premium.

Hilbush testified that she did not disagree with the proposition that a surety bond would command a substantial premium, which, in essence, would be an equity return. GMAC assessed that Zurich bore the ownership exposure. GMAC served the healthcare industry as a major lender. Hilbush testified that, in her experience, she had not participated in another transaction like the SLP transaction. Shine also testified that GMAC did not engage in another transaction with a surety. Hilbush testified that she never worked on a transaction where premiums were paid as a percentage of free cash flow. Nevertheless, she did not understand Zurich to agree to perform any role other than as a surety.

A premium for a surety bond should cover the costs of the undertaking with a reasonable profit. Dolan opined that in a fee structure for a loan, the typical profit factor above the costs would be one to two percent. The greater the perceived risks, the more likely the two percent factor would be used. If the surety provider obtained a greater amount, then something more than a premium was involved. While not an expert on the pricing of surety bonds, Dolan testified that the charges in the agreement were too high for merely a premium, however risky the undertaking.

Hass testified that the costs of the undertaking could be measured by the capital Zurich had to reserve to cover the bond. Hass testified that Zurich had to reserve enough capital as if the surety bond carried a BB rating. He testified that amount would be 100% of the guaranty in this transaction, or $146 million. Hass

further testified that, at the mezzanine level, Zurich would expect a fourteen to eighteen percent return on an investment of that capital.

In the March 16, 1998, memorandum to Fishman, Centre reported its assessment that to cover its costs Centre projected anticipated base and additional premiums to total $115 million, with a net present value basis of $67 million. Centre projected an eighty-one percent likelihood that the guaranty would not be called. Centre figured Zurich would realize the $67 million as a "base case profit." Actually, Centre projected "an average profit" on the eighty-one percent probability that the guaranty would not be called of $75 million. Centre projected only a one percent probability of a "maximum loss." But, considering the "unlikely possibility of a maximum loss," Centre expected to place reinsurance coverage to "reduce our downside exposure to something in the range of $30–35MM." Centre figured the reinsurance premium "over the life of the deal of less than $5MM."

Contrary to Hass' testimony, Centre would purchase reinsurance thereby minimizing the amount of capital to hold in reserve. Centre would incur costs of $5 million for the reinsurance. Centre figured its maximum exposure, with the reinsurance, would then be $30 to $35 million dollars. At mezzanine rates of fourteen percent, according to Hass, that would command a return of $4.9 million per year. In round figures, the cost of the undertaking would be $50 million over ten years plus the $5 million reinsurance premium, for a total of $55 million, not reduced to present value.

Centre projected a present value base case profit of $67 million, and an average profit of $75 million. Thus, Zurich project-

ed a return substantially above its costs.[1] As the base and additional premiums for the insurance would cover Zurich's costs plus a reasonable profit, the anticipated excess including the seventy percent of free cash flow must have been intended to constitute a share in profits by obtaining an equity position. Indeed, Centre's analysis figured a thirty-six percent return, compared to Hass' testimony that a mezzanine lender would anticipate a fourteen to eighteen percent return. Hass testified that an equity investor would expect a return of greater than twenty-five percent. Zurich had that expectation.

Hass testified that a borrower would not pay more for a credit enhancement facility than the difference between the cost of a loan in the market with and without the enhancement. Hass testified that a fixed premium usually would be charged for a surety bond. However, if the cash flow of the borrower does not permit the annual payment of the premium, a performance premium may be used to address the deferred portion of the premium payment. The premium amount would then be contingent on the cash flow levels. With the need for a deferred payment of the premium because of a borrower's cash flow, the risk of payment would be factored into the upside of the transaction, and be addressed by equity consideration for the surety company. Typically, the debt would be subordinated, with the equity addressed by warrants.

Thomas opined that Zurich guaranteed a highly leveraged cash flow transaction. The underlying credit strength turned on SLP's projected cash flow. Because of the uncertainty, Zurich had to defer its compensation. As a result, Zurich had to structure the premium for back end payments.

In responding to a hypothetical model posed by Zurich, Thomas testified that had Zurich made a $146 million loan with a fourteen percent interest rate, and an $80 million investment grade loan, SLP would have paid interest and principal over ten years of $195 million. Zurich projected compensation of $115.5 over the ten years, making the Zurich obligation less than the difference between the costs of a loan with and without the enhancement. This hypothetical presupposes that SLP could obtain a loan of $146 million junior to a senior GMAC loan of $80 million, with no equity contribution by an investor.

But, based on Centre's analysis, that hypothetical does not reflect the actual market at the time of the transaction. Without a surety, Centre figured that SLP could obtain a senior loan of $190 million and a mezzanine loan of $15 million, provided SLP raised $21 million in equity. With the surety, the two loans and the equity contribution could be rolled into a single loan. If SLP raised $21 million in equity, Centre figured a senior loan with interest at 230 basis points above the treasury yield or 7.8%, and a mezzanine loan with interest of twelve percent per annum. SLP's ten-year interest-only service on those two loans would equal about $166 million. With the surety, figuring interest-only payments for ten years, Zurich projected that SLP would pay GMAC about $138 million and Zurich, $115.5 million, for a total of $253.5 million, well above the market difference.

Furthermore, Centre's own assessment figured that Zurich would "capture [through the base premium and the addi-

---

1. The memorandum estimated the surety bond to guarantee $126 million of debt. Ultimately, Zurich guaranteed $146 million. The costs of the undertaking for Zurich would thereby increase somewhat. But the increase would not alter the analysis that Zurich intended to obtain a sufficient return to share in profits by obtaining equity.

tional premium] 100% of the difference" of the cost of borrowed funds between the transaction with the surety and a transaction with a senior loan and a mezzanine loan without the surety. "In addition we receive equity returns, in excess of 70% of the economic upside."

Dolan testified that a borrower would not pay seventy or ninety percent of its free cash flow or of its net market value for credit enhancement, especially when the transaction is secured by a mortgage on 87 nursing homes, with an appraised value of $282 million. The cost of the credit enhancement would be greater than the market costs for a below investment grade loan in the actual market as projected by Centre. Dolan testified that a prudent business person would raise capital and not pay more for credit enhancement than the business gets out of it. As a result, Dolan questioned whether something more than a debtor-creditor relationship had been intended by the parties.

Zurich's analysis reflects that Zurich intended to obtain an equity position and to share in the profits. Centre determined that the difference in basis points between a total senior loan and mezzanine loan of $205 million and the surety transaction "inures to the benefit of the surety provider." "The $21 million that would have been equity is now part of the single loan." Centre projects that "[a] portion of the premium structure captures" a return on the equity portion of the loan. "In addition we capture in excess of 70% of the equity economics, 100% of the first $4MM million in excess cash flow each year plus 70% of every dollar above $4MM."

At the time of the transaction, GMAC appraised the property at $282 million. As Baker reported to Fishman in the March 16, 1998, memorandum, Centre figured that the nursing homes would maintain their value. The appraised value was 115% of the actual purchase price of the property. The price as a multiple of earnings was less than the industry average. A one percent increase in census would result in a $1 million increase in annual profit. CCS had the experience to meet the management performance expectations. Thus, Centre assumed that the nursing homes would at least maintain their value.

With that value, in year ten, if SLP sold the nursing homes, the GMAC, CCS and Park Associates notes would be paid, with equity of $38 million remaining. With seventy percent of the net market value, Zurich would obtain $26.6 million, assuming CCS remained the manager in year ten. That projects consistently with Centre's internal assessment of an equity component of $21 million. As Baker wrote, by providing the surety, Zurich "was able to capture significant equity economics with no cash outlay."

Although Hass had no direct experience with a similar transaction, he nevertheless opined that Zurich negotiated only for a creditor position in the Reimbursement Agreement. Hass stated that the pricing structure of the surety bond was consistent with mezzanine financing transactions. That opinion conflicted with Hass' description of how the market for credit enhancement operates. Hass would look to a fourteen percent total return on the cost of the undertaking for the surety company, including the risks. Centre projected a thirty-six percent return. Hass testified that the additional return typically takes the form of equity. That was what Zurich intended.

Zurich thereby intended that the price structure of the credit enhancement surety loan include both a premium for the surety bond and a sharing in the profits of the operations of the nursing home with an equity return.

Based on the parol evidence, Lain has established by clear and convincing evidence that Zurich intended to obtain a share in the profits as well as recover a premium for the surety as a creditor. Zurich intended to obtain a share of the profits in the manner it structured SLP's payments to Zurich and by assuring an equity return in the transaction. The parol evidence of the negotiations, the document protections, the internal Centre analysis and the pricing of the transaction all support the finding that Zurich intended to obtain a share of the profits. Consequently, whether the court restricts its analysis to the Reimbursement Agreement or considers the parol evidence, Lain has met his burden of proof that Zurich would receive a share of the profits.

As found above, under Illinois law, "the receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business." 805 ILCS 205/7(4). The inference shall not be drawn, however, if certain exceptions apply. The inference does not apply if the payments were received as "a debt by installments or otherwise." 805 ILCS 205/7(4)(a). As found above, Zurich received payments on a debt for the surety bond. In addition, Zurich contracted to receive payments beyond the debt, as an equity return. The inference applies to the payments beyond the debt; namely, the payments in addition to the debt.

The inference does not apply if the payments were received as wages or as an annuity. Zurich would not receive payments as wages or as an annuity. The inference does not apply if the payments were received as interest on a loan, though the amount of payment varies with the profits of the business. Zurich did not loan any money to SLP. SLP purchased an insurance surety bond from Zurich. SLP and Zurich contracted for the payment of the premium for that insurance, with an established base and additional premium payment. The premium did not apply to interest on a loan or to principal on a loan. Zurich contends that its share of the free cash flow compensated Zurich for the guaranty of the GMAC loan. Zurich argues that it rented its credit rating to SLP. SLP paid a premium for the bond. SLP had a contractual obligation to pay Zurich for any advancements made under the bond. Beyond the premium for the surety bond, Zurich contracted to receive a share of the profits, albeit with the amount figured as a percentage of the profits.

The inference does not apply if the payments were received as consideration for the sale of the goodwill of a business or other property by installments or otherwise. SLP did not contract with Zurich for the payments to be consideration for the sale of the goodwill of its business or other property. None of the exceptions to the application of the inference apply.

Accordingly, under Illinois law, Lain has established a prima facie case that Zurich is a partner in the SLP business. 805 ILCS 205/7(4).

*Integration Clause*

The Reimbursement Agreement contains an integration clause, providing that the Agreement constitutes the entire agreement and understanding among the parties and supercedes all prior agreements and understandings, oral or written. The management agreement has a similar provision. Ehmann testified that CCS wanted to focus on the final documents, not on the negotiations swirling around the documents.

Application of the integration clause would remove from the court's consideration the evidence of the evolution of the parties' relationship. The court would not consider the negotiations, strategies and

objectives of the parties from the beginning of the transaction to its closing. SLP and Zurich contracted in the Reimbursement Agreement for Zurich to share in the profits of the business. That is prima facie evidence that makes Zurich a partner by operation of Illinois law.

Ironically, Zurich contends that the court should not consider parol evidence because of the integration clause. The court would only consider the parol evidence if the Reimbursement Agreement was ambiguous. Without ambiguity, the court would not consider prior agreements and understandings, as provided in the integration clause. The Reimbursement Agreement unambiguously provides for a share of the profits to be paid to Zurich. In its findings and conclusions, the court does not consider prior agreements or understandings.

The court addressed the parol evidence, including the understandings of the parties, for purposes of completeness should a reviewing court determine that the contract was ambiguous, thereby necessitating an analysis of other evidence to determine Zurich's intent.

### Rebuttable Presumption

Because Zurich contracted with SLP to receive a share of the profits of SLP's business, Lain has established prima facie evidence that Zurich was a partner in SLP's business. 805 ILCS 205/7(4). Illinois courts and federal courts applying Illinois law have suggested that additional evidence would be needed to establish a partnership. *Chen*, 1998 WL 27140 at *8 ("[t]he sharing of profits is prima facie evidence of the existence of a partnership, but not sufficient evidence of such a relationship."); *Argianas*, 197 Ill.Dec. 900, 631 N.E.2d at 1370. These statements must be read in the context of the evidence in each case. The judicial decisions do not

undermine or negate the Illinois statutory command that sharing of profits is prima facie evidence of a partnership. "Prima facie" means "sufficient to establish a fact or raise a presumption unless disproved or rebutted." Black's Law Dictionary 1209 (7th ed.1999). "Prima facie evidence" is "evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." *Id.* at 579. Without evidence to rebut the prima facie case, Lain has established a partnership.

■ The Illinois cases instruct the court to review the evidence of the facts and circumstances surrounding the alleged formation of the partnership to determine if Zurich has rebutted that prima facie evidence. *Barratt*, 1999 WL 967513 at *1. At the close of Lain's evidence, Zurich moved the court, under Fed.R.Civ.P. 52(c), made applicable by Bankruptcy Rule 7052(c), for a judgment on partial findings, contending that Lain did not establish several essential elements for a partnership. Since Lain has established prima facie evidence of a partnership, the court must consider and weigh all the evidence to determine whether the prima facie case survives. *In re Estate of Goldstein*, 293 Ill.App.3d 700, 227 Ill.Dec. 991, 688 N.E.2d 684, 690 (1997) (applying parallel Illinois civil rule). Through its motion for a judgment on partial findings, Zurich has highlighted evidence to rebut the prima facie case for a partnership.

The parties did not execute a document titled partnership agreement between SLP and Zurich. The parties did not file a declaration or certificate of partnership with a county clerk in Illinois. There is no evidence that the parties did business under a partnership name. The parties did not advertise as a partnership. SLP did not advertise that it operated its business in partnership with Zurich. The parties did not create telephone or other listings

as a partnership. They did not file partnership tax returns. They did have a debtor-creditor relationship with SLP purchasing a surety bond from Zurich for a premium and having a contractual obligation to reimburse Zurich for payments Zurich makes under the surety bond. The Reimbursement Agreement does not refer to Zurich and SLP as partners. Other closing documents suggest that SLP did not have a partner. The GMAC note states that SLP as borrower and the holder of the note had a debtor-creditor relationship, so that the note should not be construed as creating a partnership. The definition of a holder of the note includes the surety company.

 This evidence rebuts the prima facie case for a partnership. But, it does not defeat Lain's case. Accordingly, the court denies Zurich's motion and turns, instead, to determine if Lain has established a partnership by clear and convincing evidence. With the statutory presumption rebutted, mere participation in profits does not of itself create a partnership. *Argianas*, 197 Ill.Dec. 900, 631 N.E.2d at 1368. Nevertheless, a contract to share profits remains the essential test. *Barratt*, 1999 WL 967513 at *1. On the other hand, a partnership may exist without the sharing of losses. *Argianas*, 197 Ill.Dec. 900, 631 N.E.2d at 1368. In the following sections, the court makes its findings concerning the other indicia that the parties intended to form a partnership.

*Monitoring and Management Involvement*

Following the closing, Zurich actively engaged in monitoring SLP's performance. The CCS management agreements governed the daily operations of the nursing homes. SLP provided oversight of the daily operations, including licensure and state filing procedures, visiting the nursing homes, participating in the accounts receivable and accounts payable process, implementing procedures relating to Medicare and Medicaid issues and approving the budget. Zurich, on the other hand, did not exercise continuous and systematic control over the daily operations. However, Zurich engaged SLP's management concerning operational and budget considerations.

Licari testified that Zurich monitored the change of ownership status following the closing, and followed the census survey reports, calling CCS with problems and concerns. The reports detailed several problems per nursing home, which CCS had to address. Licari felt that, at times, he spent more time addressing Zurich than attending to the status and survey reports. Finkel and Zail both requested information from CCS.

CCS issued monthly reports to Zurich, but also to SLP's board and to GMAC. Licari spent time responding to Finkel, who often posed questions involving field operations work.

Zurich regularly attended SLP quarterly board meetings.

CCS attended the board meetings as property manager. Hilbush testified that GMAC also regularly attended the meetings. Fishman attended. Baker sought to retain ZA Consulting to monitor SLP's financial performance for Zurich. Zurich drafted an engagement letter to retain ZA Consulting for that purpose.

All the parties to the transaction participated in the initial post-closing budget formulation. Zurich followed the budget process in 1998 and 1999. In 1999, the parties confronted Medicare changes, which intensified Zurich's budget involvement. Licari estimated a loss of revenue in 1999 because of Medicare changes. SLP experienced a dramatic difference between the

forecasted performance of the nursing homes and the actual performance. That resulted in budget and operational discussions at Zurich's office, with Licari, Baker and Zail present. GMAC also attended the meeting. CCS proposed to reduce operational expenses by $7.5 million and to reduce its management fee to four percent. Licari testified that as the revenue declined, Zurich's involvement increased.

Finkel requested information on the census of specific homes. Licari discussed staffing ratios with Finkel at the regional level. Finkel testified that Zail actually monitored SLP's operations, giving her reports. Zurich became concerned that CCS had spread itself "too thin." Meanwhile, during mid–1999, Eden and Bonds increased their involvement with the management of SLP.

In October 1999, Licari had a breakfast meeting with Baker. Baker suggested that CCS increase its focus on SLP by reducing its management involvement with other nursing homes.

Baker prepared an agenda for a December 16, 1999, meeting to discuss operational issues. Baker sent the agenda to Fishman and Greg Lentz of ZA Consulting. The agenda included health department notifications to the nursing homes and staffing issues. Several nursing homes faced reports of sub-standard care that required attention. Lentz testified that he found that level of involvement unusual for a surety creditor, as contrasted with the owners and managers of the nursing homes and their lawyers.

SLP terminated CCS as manager on December 10, 1999. After that event, Zurich further intensified its involvement with management issues. Rudy Dimmling, a Zurich vice president, testified that CCS left SLP's books and records in disarray. Zurich participated in lengthy conferences with GMAC and ZA Consulting

concerning SLP's financial condition. Patricia Aprill, Centre's comptroller and a vice president, testified that Zurich prepared a memorandum addressing the deterioration of SLP's business and a plan of action to collect accounts receivable. She challenged the follow-up on quality of control and management issues, even though she testified that Zurich was a creditor. Zurich was concerned about incurring a loss on its surety bond. Hilbush confirmed that during this time period SLP's business deteriorated. SLP suffered from declining census, difficulty collecting accounts receivable, inaccurate Medicare claims and nursing shortages. With troubled healthcare loans, lenders had to increase their monitoring. Accordingly, Hilbush testified that GMAC increased its oversight as well.

In December 1999, CCS had notified SLP that it would be unable to make a timely payment on the GMAC note. SLP recognized that it would be treated by its creditors as if a default occurred. GMAC and Zurich increased their level of monitoring SLP, proceeding in a loan workout mode. Zurich, like GMAC, increased its requests for financial and performance information, participated in the budget discussions, implemented oversight plans and pursued increases to working capital. Zurich did not, however, declare a default with respect to financial difficulties until October 2001.

Nevertheless, in December 1999, Zurich went beyond that oversight function to actually take control over cash management and borrowed funds. Zurich had ZA Consulting appointed to manage the cash. As found below, Zurich then directed the priority of payments and arranged for working capital financing. Then in March 2000, Zurich exercised control over both the Texas and Illinois receivables.

Joe Tutera, a health care property manager, testified that a creditor would typically review financial operations, assuming a more intense role if financial conditions deteriorated. SLP hired Tutera to manage the Illinois homes. Tutera testified that Zurich was not involved in daily management operations. Joseph Emmanuel, a nursing home administrator, worked for SLP's Texas division. He never met with Zurich or experienced any involvement by Zurich with daily management operations.

Thomas testified that with a business in financial stress, the creditors would become more involved in the financial review and monitoring. Creditors would take a more active role to attempt to prevent a loss. Even before an actual event of default, creditors may consider the business in a workout mode, increasing the level of involvement and scrutiny. Abbott agreed that in a workout situation, a lender would exercise its monitoring rights.

The court finds that Zurich's financial monitoring tracked that of a creditor. But, when Zurich engaged in the actual control of management or of SLP's business, Zurich went beyond the typical role of a creditor. Zurich then acted more like an owner or a holder of an equity interest.

### Termination of Management

On December 10, 1999, SLP terminated CCS as manager. As early as May 1999, Finkel suggested to Lentz at ZA Consulting that CCS's resources had been spread too thin. Zurich wanted CCS to make changes in its business. Lentz confirmed receiving that assessment from Zurich. Lentz presented Zurich's concerns to CCS.

By late 1999, Bonds suggested that SLP terminate CCS. But Baker did not consent to the termination. As a result, SLP gave CCS thirty days to cure its allegedly deficient performance. Bonds and Eden met with Zurich in New York. At that meeting, Zurich consented to SLP's termination of CCS. Baker as the underwriter, Alden Warner as the workout leader and a Zurich attorney advocated the termination at the meeting. Although SLP had given CCS a thirty-day cure letter, Zurich insisted on an immediate termination.

Hilbush testified that GMAC, the mortgage holder, played no role in the decision to terminate CCS. However, after a meeting at GMAC's offices with Lentz and Eden or Bonds, GMAC consented to the termination.

After Zurich exercised its sole discretion concerning termination of management, SLP issued the termination letter. Rather than advising and consenting after a due diligence review of management's performance as GMAC did, Zurich held and exercised the ultimate authority to terminate CCS as manager.

### Employment of New Management

Aprill testified that Zurich felt burned by CCS. As a result, Zurich retained professionals on behalf of SLP to assist Zurich in considering prospective new management. Zurich inquired internally whether "we" should open the field to various potential managers. Aprill testified that Zurich was only performing due diligence regarding management to protect its exposure. Aprill felt that Zurich would have to be involved with new management in a plan of action to collect accounts receivable.

Hilbush testified that Zurich's professionals assessed the management prospects. She also testified that Zurich's attorneys reviewed the prospective managements' credentials and regulatory compliance record. Hilbush testified that GMAC did not get involved in hiring new management. But Shine testified that GMAC had some involvement in the

consideration of new management for the Illinois homes but did not participate in the selection.

Dimmling testified that he personally interviewed a management candidate for Texas. He said that Eden invited Zurich to attend the interview. Eden and Bonds were ready to employ the candidate. But Dimmling approached the candidate cautiously as the candidate had just completed Chapter 11 proceedings. SLP could not act until Zurich completed its due diligence. That candidate pulled itself from consideration. Zurich never provided its consent pursuant to the Reimbursement Agreement for SLP to retain new management for the Texas homes. Dimmling testified that SLP's business was in dire straits, requiring prudent action on Zurich's part. Eden's firm, Eden & Associates, managed the Texas nursing homes.

Tutera testified that secured creditors typically would be involved in the review and approval of management process. Creditors would typically exercise their due diligence by interviewing him and his staff and reviewing his firm's resumé. After the completion of the hiring process, Tutera testified that his management company would not usually have direct contact with the creditors. Rather, the management company would provide financial and other information to the owner, who would provide the information to the secured creditor.

In late 1999 or early 2000, Tutera contacted Eden about his interest in managing the SLP nursing homes. In his conversations with Eden, Tutera never understood that SLP had a partner or that SLP considered Zurich a partner or owner. Eden chaired an interview with his firm, attended by Zurich and ZA Consulting representatives, as well as Bonds. Tutera testified that the parties engaged in a typical interview. Tut-

era recognized that its business strengths focused on Illinois. With Zurich's approval, SLP retained Tutera's services in Illinois. After entering its contract, Tutera dealt with SLP. Tutera had no daily operational contact with Zurich. But SLP did not make all its required payments to Tutera. As a result, Zurich made payments under the surety bond. Tutera's contract with SLP terminated on August 1, 2003.

Tutera engaged Zurich in discussions, however, concerning liability insurance. Tutera and Zurich discussed a $500,000 per claim limit, with the idea of minimizing claims against the nursing homes by restricting the coverage amounts. However, Tutera and Zurich discussed a side agreement for Tutera to increase the amount of coverage. In addition, Zurich indemnified Tutera for his work for SLP.

Thomas testified that in a workout situation, a lender would be involved in the selection of management. Thomas opined that the owner may not be able to retain new management without the creditor's consent. However, even though secured creditors may typically perform due diligence concerning property managers and have a monitoring function in the selection of management, there is no evidence to support a finding that a creditor typically negotiates with a property manager to hide insurance coverage from potential claimants. That activity undermines the credibility of Tutera's testimony that Zurich acted consistent with the role of a creditor. To the contrary, involvement in negotiations for that type of insurance coverage suggests the actions of an owner attempting to minimize exposure.

*Priorities*

As found above, the Reimbursement Agreement's waterfall provided for the payment of operating expenses, including

vendors, before payment of GMAC debt service. However, Zurich unilaterally altered the waterfall priority after December 1999. Beginning on December 10, 1999, Zail directed the priority of payments to vendors based on the nursing home facility. Before CCS's management contract had been terminated, Licari testified that he talked to Zail about paying specific vendors. Licari testified that Zail wanted to make sure that the largest players were paid. Licari expressed concern that the smaller businesses in the various communities not be harmed.

But after SLP terminated CCS, with Zurich's consent, Lentz exercised control of the cash at the direction of Zurich. Lentz met with Zail. Zail dictated the vendor payment priority, according to Lentz. Zail did not want to pay for rehabilitation services and other vendors. Lentz testified that he wanted to pay the local vendors first, then the national vendors. Zail did not agree. ZA Consulting would propose the vendors to pay. Zail never "rubber stamped" ZA Consulting's proposals. If Zail did not approve the payment, Lentz would not process a draw request. Lentz testified that Zurich wanted to assure that SLP paid the GMAC note, regardless of the waterfall contractual provisions.

Bonds confirmed that he understood CCS had submitted payment statements to Zurich and that ZA Consulting submitted payment requests to Zail.

Zail did not recall any involvement with paying vendors. He did not recall meeting with Lentz and other ZA Consulting personnel regarding setting the priority of payment of vendors. The court finds Lentz's account more credible than Zail's account. ZA Consulting had no motivation to alter the priority of payment of vendors. Zurich had the motivation; namely, avoid a call on the surety bond and protect its equity upside in the transaction. Although

inconsistent with the Reimbursement Agreement, Zail's cash use instructions resulted in the payment of GMAC as a priority over vendors, thereby delaying or avoiding an obligation for Zurich to make a payment under the surety bond.

Thomas testified that Zurich made a mistake by dictating the payment priorities. Thomas concluded that Zurich erred because its directives were inconsistent with the waterfall. The recognition of a mistake by Thomas is an acknowledgment by Zurich's expert that Zurich had that level of control over SLP's operations to be able to dictate a deviation from the contractual provisions of the waterfall.

*Retention of Professionals*

Zurich directed the retention of professional persons by SLP. Marc Adelson of Centre signed an engagement contract with KPMG to be retained by SLP to evaluate potential management companies. Aprill testified that she did not know why Centre executed a contract for SLP. KPMG evaluated potential management companies. KPMG prepared a report of its work for Centre or Zurich, not for SLP. KPMG exercised substantial authority regarding the review of prospective property managers, even excluding candidates from consideration. Aprill testified that Zurich had been burned by CCS as manager and Zurich wanted KPMG to screen and assess potential new management.

Bonds testified that he did not authorize SLP to engage KPMG in August 2000. In fact, Bonds testified that he did not see the engagement letter. He never agreed to cooperate with KPMG, let alone limit its exposure for work on SLP's behalf. SLP did not authorize the KPMG contract.

Aprill testified that Zurich had PricewaterhouseCoopers hired for SLP as a financial advisor. Dimmling testified that

Zurich wanted to retain Pricewaterhouse-Coopers for SLP because of SLP's lack of progress in addressing its financial condition. Dimmling acknowledged that Zurich pressured SLP to hire the financial consultants. Zurich issued a $1 million surety bond to assure payment of PricewaterhouseCoopers' fees.

Tutera testified that SLP had an unusual number of consultants. In addition to KPMG, Survey Capital Associates reviewed Tutera's work. Tutera understood that Zurich retained Survey Capital Associates. Zurich-retained lawyers reviewed Tutera's regulatory compliance. Zurich agreed to indemnify Tutera for its work for SLP.

Thomas labeled the KPMG retention by Zurich for SLP as "awkward." Thomas testified that Zurich, as a creditor, should not have been employing professional persons for SLP. Thomas concluded that Zurich must have again erred in its actions. Thomas recognized that a creditor could assume different roles as parties negotiated a transaction. Thomas could provide no examples, however, of a transaction structured similar to this transaction. The court infers that Zurich may not have erred at all. To the contrary, it merely exercised the control it obtained in the transaction.

### Credit

In addition, Zurich arranged for and negotiated extended credit from Heller. Eden testified that after December 14, 1999, he learned that Zurich obtained additional credit for SLP from Heller. Eden did not participate in negotiations with Heller for that extended credit. Finkel acknowledged that Zurich discussed additional credit with Heller. She could not or would not explain why the surety provider and not the borrower would negotiate credit for SLP. She merely testified that

another person at Centre, Warner, directed that Zurich or Centre perform that role. Hilbush understood that SLP needed additional credit and obtained that credit from Heller, with Zurich issuing a surety bond to guarantee the Heller debt. Dimmling recognized that Zurich issued a surety bond for Heller. Dimmling testified that Zurich had to approve Heller's borrowing base. Zurich never declined a borrowing base submission from Heller.

Heller would only increase its line of credit if Zurich provided a surety bond as additional security to guarantee repayment of Heller advances. Zurich executed a surety bond to extend additional credit and to facilitate the increased funding. Thereafter, in late 2000, SLP experienced further cash flow difficulties. Heller refused to provide further increases to its line of credit. At that time, Zurich had begun making payments to GMAC. A Zurich-related entity agreed to loan SLP $15 million. The Zurich-related entity had to review all draws made on the loan.

Thomas testified that negotiations by Zurich with Heller for operating loans for SLP without SLP's involvement or prior agreement would be "unusual" for a creditor. From this evidence, the court finds that Zurich exercised a degree of control as an equity holder in the business of SLP, rather than merely a creditor.

### Compensation

Eden and Bonds received compensation from SLP. SLP paid them $400,000 in salaries, which Hass opined would be reasonable compensation for their role at SLP. SLP paid Eden & Associates for services rendered to SLP. Licari testified that, while CCS managed the properties, Baker and then Zail authorized payment of the Eden & Associates invoices. Beginning in January 2000, Eden submitted requests to Zail to approve payment of Eden

& Associates' invoices. Baker testified that he did not request that Centre or Zurich approve any particular payment. Zail testified that he did not believe that he had a right of approval before Eden or Bonds or Eden & Associates could be paid. He testified that he had requested information but did not believe that would have left the impression that he had approval authority. Zail recognized several written requests for approval of payments from Eden & Associates. He testified that he needed the written request because of the impact on the limit of the surety bond with Heller. Zail had commented that "these guys," meaning Eden and Bonds, "were getting expensive." Zail acknowledged that he made that comment to Baker. Bonds testified that Eden and Bonds did become more involved after the termination of CCS.

After the termination of CCS as manager, Bonds testified that he understood that Zurich would indemnify him and Eden for their SLP work. Bonds testified that he and Eden informed Zurich that they had not entered the transaction to assume the risk of actually managing the nursing homes. For that reason, they requested that Zurich indemnify them if they performed a management function. These conversations notwithstanding, Eden, Bonds and Zurich never executed a written indemnification agreement. Except as provided in the Reimbursement Agreement, SLP could not pay operational profits to Eden and Bonds. In essence, Zurich controlled the distribution of profits.

Monitoring salaries pursuant to the waterfall would be consistent with Zurich's role as a creditor. But approving the actual payment of services rendered, controlling the distribution of profits and discussing indemnifying Eden's and Bonds' expanding role at SLP would be more consistent with Zurich's role as a partner.

## Summary

Monitoring financial and operational performance, budget considerations, management, accounts collection and workout strategies are all consistent with the role of a creditor. However, Illinois law recognizes that a partner may perform those same functions. Controlling the extension of the GMAC loan maturity date to protect its return on its investment, exercising sole discretion on the termination and hiring of management, directing the cash management system for SLP, directing the payment of vendors, retaining professional persons for the business, discussing indemnification of managers and members working for SLP, and arranging for and deciding on the extension of credit to SLP are all consistent with the role of a partner exercising control over the business of the partnership.

## Sharing of Losses

Case law considers that an obligation to share in the losses of a business enterprise constitutes an indicia of ownership. Zurich contracted for the surety risk of $146 million. With a balloon payment on the GMAC loan due at year ten, Zurich faced a risk of loss at the end of the initial term of the GMAC loan. Centre recognized in its 1998 annual report that "in addition, we provided cash flow support for the $234 million acquisition of nursing homes in the United States by Senior Living Properties, L.L.C., thereby assuming the occupancy and operational risks associated with this business." Indeed, immediately after the closing, SLP had $246 million in debt but only $200 in cash equity.

SLP's mortgage amount had a loan to value ratio of eighty percent. But SLP would pay operating expenses, taxes and debt service, and provide for capital expenditures, from its income stream. GMAC

valued SLP's real property based on the income approach to valuation. Zurich considered the income stream in assessing SLP's ability to pay operating expenses and debt service. Zurich agreed that the initial capital structure of SLP would only have $200 in equity capital. SLP therefore had no equity capital reserve to pay expenses or debt service if its cash flow faltered. Zurich agreed to cover that shortfall up to the amount of the surety bond. If that kind of cash flow shortage occurred, the income approach to valuation would result in a decreased value. Zurich knew that if the cash flow shortfall continued, Zurich risked the loss of its advances under the surety agreement.

Beyond that, Zurich agreed to absorb one-half of any losses of CCS on its $10 million note. Eden and Bonds engaged Zurich in discussions about indemnification, but the parties never entered a written indemnification agreement. Zurich issued a $1 million surety bond to guarantee that PricewaterhouseCoopers' fees would be paid. Zurich also guaranteed Tutera management fees and indemnified Tutera without charging Tutera an additional premium. Contrary to Zurich's contention, these constitute examples of loss sharing. On the other hand, other than their $200 investment, Eden and Bonds had no financial risks in the business enterprise.

As described above, under the waterfall provisions of the Reimbursement Agreement, SLP would pay operating expenses before paying the GMAC note. In any given month, if revenues were not sufficient to pay operating expenses and the GMAC note, the operating expenses would be paid, and the resulting shortfall available for servicing the GMAC note would be paid by Zurich.

Considering the breadth of the surety bond, the lack of equity capital, the obligation to cover monthly shortfalls, indem-

nifications for property managers and professional persons, and discussions about indemnification with the owners, Zurich agreed to share the risk of loss in the transaction.

*Other Issues*

Zurich contends that a partnership cannot be established without commencement and termination dates. Zurich contracted with SLP on February 6, 1998. That would establish the commencement date. Zurich did not terminate its status as a partner prior to the SLP bankruptcy cases. Zurich's obligations under the surety bond would have ended on the GMAC maturity date, which had not been reached prior to the bankruptcy cases. Zurich had the contractual authority to extend that maturity date. Zurich also had the contractual authority to control the sale or distribution of SLP's assets.

Zurich argues that a finding that Zurich became a partner in SLP's business would mean that the parties to the transaction participated in an "illicit" scheme to hide the true nature of Zurich's involvement. This is not a fraud case. Lain does not allege an "illicit" scheme. The court does not find an "illicit" scheme. Rather, the transaction resulted in Zurich becoming a partner in the transaction. As the court has found, the Reimbursement Agreement is not ambiguous. Zurich contracted for the payment of a premium for the surety bond in a debtor-creditor relationship and for the receipt of profits in an equity relationship. Zurich asserts that it makes little sense for it to have intended to become a partner, especially considering its lack of experience in the health care business. But, as found above, Centre had an interest in investing in the nursing home industry. Centre's internal analysis predicted significant returns on its investment. Centre's aggressive strategy was based on

its sophisticated analysis. *See* 1998 Centre Annual Report, titled "Out of Our Minds." That analysis made sense to Centre for Zurich to make the investment and assume the role. Not all financial predictions ring true. The failure of SLP's business does not alter the intention of the parties at the time of the transaction.

Contrary to Zurich's arguments, a partnership relationship that requires Zurich to pay the outstanding vendors and personal injury claimants who should have been covered by insurance purchased as a first priority under the waterfall preserves the contractual provisions the parties bargained for. That other creditors may be paid as well merely reflects the application of Illinois law.

Zurich argues that the various provisions of the Reimbursement Agreement and the actions taken thereunder by Zurich are common in the mezzanine finance business. To the contrary, neither Thomas nor Hass could provide another example of a similar contractual relationship, let alone one in the health care industry. They both acknowledged unique provisions in the transaction or unorthodox actions taken by Zurich, with Thomas suggesting those acts were "errors." Hilbush confirmed the uniqueness of the transaction.

Centre is no longer in the credit enhancing business in the nursing home industry. Hass testified that in mid–1997, the government changed the way nursing homes would be funded. By 1999, Hass explained, the nursing home business was in default. Hass noted that the Zurich–SLP transaction was one of the last highly leveraged nursing home transactions. He added that sureties stopped ·getting involved in deals like that one after that time because rating agencies changed the way bonding companies could set aside for a transaction like this and doubled the amount to set aside for this type of transaction.

Zurich also argues that Lain should be precluded from asserting that Zurich became a partner in SLP's business. In Texas state court litigation brought by a personal injury claimant, SLP, answering an interrogatory, stated that it was not in a partnership. An admission by a party in one lawsuit "is not an admission for any other purpose nor may it be used against the party in any other proceeding." Fed.R.Civ.P. 36(b), made applicable by Bankruptcy Rule 7036. An admission may only be used in the pending proceeding where it was made. *Id.* The Texas rules provide likewise. Tex.R. Civ. P. 198.3. Consequently, Lain is not precluded by SLP's response in the tort litigation in state court.

Lain addresses issues pertaining to the doctrine of *in pari delicto*. Zurich has not pursued those issues. Furthermore, the court has addressed the evidentiary effect of partnership statements in the loan documents in the above findings.

The parties have extensively argued competing case law. As a trial court applying Illinois law, with Texas law considered for purposes of completeness, the court has limited its consideration of cases to Illinois cases and federal district or Seventh Circuit decisions primarily applying Illinois law, or Texas cases and federal district or Fifth Circuit decisions primarily applying Texas law. Consideration of case law from other jurisdictions; even applying similar laws, is deferred to the law-making function of an appellate court.

### Conclusion

Under Illinois law, Lain established a prima facie case that Zurich is a partner in the SLP business. Zurich rebutted that presumption.

Lain then established by clear and convincing evidence that Zurich is a partner in the SLP business. Zurich contracted to share in the profits of SLP's business, which is the essential term for a partnership under Illinois law. Zurich contracted to obtain a residual interest of seventy to ninety percent of the fair market value of SLP as a going concern; that is, Zurich contracted for a distribution of equity. Zurich acted as an owner in contracting for the payment of all operating expenses, debt service and capital improvement expenditures before distribution of profits. Zurich contracted to cover debt service if SLP's revenue would not pay operating expenses and the mortgage. Zurich contracted to assure that creditors were paid before excess cash was distributed to equity level interests. Zurich had ultimate control of the hiring and termination of the management of the nursing homes. Zurich took control of the cash management system of SLP and could dictate the priority of payments of expenses and debt obligations, with a level of control over SLP's operations extending to dictating deviations from the contractual provisions of the waterfall. Zurich had the authority to extend the mortgage maturity date and to control the disposition of SLP's capital assets, both to protect its interest in equity. Zurich controlled the prepayment of the mortgage, not as a surety, but to protect its interest in equity. Zurich hired professional persons for SLP. Zurich exercised a degree of control as an equity holder in negotiating credit for SLP without SLP involvement in the negotiations. Zurich controlled the distribution of profits and controlled the salary of the members of SLP. Zurich negotiated indemnification of managers and members working at SLP. Zurich shared in the risk of loss. The parties actually implemented the SLP transaction, with SLP engaged in the nursing home business.

As a partner in the SLP business, Zurich is liable for SLP's debts. 805 ILCS 205/15(a)(2). The court will enter a declaratory judgment for Lain.

*Texas Law*

For purposes of completeness, the court addresses the Texas law of partnerships. The Texas Revised Partnership Act defines a partnership as:

(a) Association to Carry on Business for Profit. Except as provided by Subsections (b) and (c), an association of two or more persons to carry on a business for profit as owners creates a partnership, whether the persons intend to create a partnership and whether the association is called a 'partnership,' 'joint venture,' or other name. A partnership may be created under: (1) this Act.

Tex. Civ. Stat. Ann. art. 6132b–2.02 (2003).

The Texas Legislature enacted rules for determining if a partnership had been created.

(a) Factors Indicating Creation of Partnership. Factors indicating that persons have created a partnership include their:

(1) receipt or right to receive a share of profits of the business;

(2) expression of an intent to be partners in the business;

(3) participation or right to participate in control of the business;

(4) sharing or agreeing to share:

(A) losses of the business; or

(B) liability for claims by third parties against the business; and

(5) contributing or agreeing to contribute money or property to the business.

(b) Factors Not Indicating Creation of Partnership. One of the following circumstances, by itself, does not indicate

that a person is a partner in the business:

(1) the receipt or right to receive a share of profits:

(A) as repayment of a debt, by installments or otherwise;

(B) as payment of wages or other compensation to an employee or independent contractor;

(C) as payment of rent;

(D) as payment to a former partner, surviving spouse or representative of a deceased or disabled partner, or transferee of a partnership interest;

(E) as payment of interest or other charge on a loan, regardless of whether the amount of payment varies with the profits of the business, and including a direct or indirect present or future ownership interest in collateral or rights to income, proceeds, or increase in value derived from collateral; or

(F) as payment of consideration for the sale of a business or other property by installments or otherwise;

(2) co-ownership of property, whether in the form of joint tenancy, tenancy in common, tenancy by the entireties, joint property, community property, or part ownership, whether combined with sharing of profits from the property;

(3) sharing or having a right to share gross returns or revenues, regardless of whether the persons sharing the gross returns or revenues have a common or joint interest in the property from which the returns or revenues are derived; or

(4) ownership of mineral property under a joint operating agreement.

(c) Additional Rules. An agreement to share losses by the owners of a business is not necessary to create a partnership. Except as provided by Sections 3.06 and 7.03, a person who is not a partner in a partnership under Section 2.02 is not a partner as to a third person and is not liable to a third person under this Act. *Id.* at art. 6132b–2.03 (2003).

As in Illinois, "[e]ach partner is an agent of the partnership for the purpose of its business." *Id.* at art. 6132b–3.02(a). The act of one partner "binds the partnership if the act is for apparently carrying on in the ordinary course the partnership business." *Id.* at art. 6132b–3.02(a)(1).

With certain exceptions, that do not apply in this case, "all partners are liable jointly and severally for all debts and obligations of the partnership unless otherwise agreed by the claimant or provided by law." *Id.* at art. 6132b–3.04.

Interestingly, a partner who makes a disproportionate contribution to the preservation of the partnership's business, such as incurring liability, is entitled to be repaid from the partnership, including the receipt of interest. *Id.* at art. 6132b–4.01(c). Partners and their agents and attorneys have a right of access to the partnership's books and records. *Id.* at art. 6132b–4.03(b). On request, each partner has a duty to furnish complete and accurate information to a partner concerning the partnership. *Id.* at art. 6132–4.03(c).

 Art. 6132b–2.03 does not mandate that any one of the partnership indicators must exist. However, the case law holds that to prove the existence of a de facto partnership under Texas law, Lain must establish an express or implied agreement containing "(1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of" the business. *Sysco Food*

*Servs. of Austin, Inc. v. Miller*, No. 03–03–00078–CV, 2003 WL 21940009, at *3 (Tex. App.—Austin Aug.14, 2003, no pet.); *see also Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex.1997); *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 584–85 (Tex.App.—Houston [14 Dist.] 1999, no pet.). Although not directed by the statute, the case law suggests that if any one of these four elements is not shown, then a partnership does not exist. *Schlumberger*, 959 S.W.2d at 176. Under Texas law, Lain must establish that Zurich became a partner in SLP's business by a preponderance of the evidence. *Visage v. Marshall*, 632 S.W.2d 667, 669, 672 (Tex.App.—Tyler 1982, writ ref'd n.r.e.).

In 1961, the Fifth Circuit summarized Texas law as follows:

> if the parties entered into a contract from which it is clear that the parties contemplated joining in a common business for their common benefit to be operated for their joint account and in which they as owners each of an interest would be entitled to share as principals in the profits as such, they would be partners.

*Minute Maid Corp. v. United Foods, Inc.*, 291 F.2d 577, 583 (5th Cir.1961). The court suggested that a presumption of partnership arises by a profit sharing agreement. The court noted that the parties had not presented case law that Texas courts would hold that "the mere failure to agree in the formal contract that the parties will share the losses prevents the relationship from being that of partners." *Id.* The court assumed, however, that "additional indicia of an intent to create an partnership must be shown either in the nature of joint control by the person sought to be bound as a partner, or an express agreement to share in losses." *Id.* On rehearing, the court held that the adoption by Texas of the Uniform Partnership Act did not alter its statement of the law. *Id.* at 585.

Zurich contends that *Minute Maid* no longer accurately states Texas law, because of the Texas adoption of the Revised Uniform Partnership Act. In support of *Minute Maid*, Lain refers the court to a Ninth Circuit opinion. The Fifth Circuit has not held that *Minute Maid* no longer accurately states Texas law. While the Texas cases decided after *Minute Maid*, cited above, do hold that an agreement to share losses must be established, the Texas statute provides that an agreement to share losses by the owners of a business is not necessary to create a partnership. Tex. Civ. Stat. Ann. art. 6132b–2.03(c).

Zurich further contends that the standards applied in *Federal Sav. & Loan Ins. Corp. v. Griffin*, 935 F.2d 691, 699–700 (5th Cir.1991), govern. In *Griffin*, the Fifth Circuit, applying Texas law, held that the intent of the parties controls. The court noted that a statement in a document that the parties did not form a partnership is not conclusive. But the court considered it as evidence of intent. The debtor agreed that forty percent of its profits would be paid as interest on a loan. Citing the statute, the court held that sharing of profits if received as interest on a loan did not result in an inference of the creation of a partnership. The court also held that the absence of an express provision obligating the parties to share losses is indicative, but not conclusive, that a partnership had not been intended. Indeed, the statute provides that an agreement to share losses is not necessary to form a partnership. Under the facts of that case, the court held that the parties did not intend to form a partnership. The court turns to the facts of this case.

 Based on the findings of fact made above, the court would find that, under

Texas law, Lain has established that Zurich is a partner in the SLP business. Lain has established that Zurich had a right to receive a share of the profits of the business; Zurich had expressed an intent to be an equity owner in the business, and, accordingly, SLP and Zurich had a community of interest in the business; Zurich participated in and had a right to participate in the control of SLP's business and in the ultimate decisions concerning the management of the business; and Zurich agreed, in effect, to share in the losses of the business. Tex. Civ. Stat. Ann. art. 6132b–2.03(a). Lain has also established, under Texas law, that Zurich did not agree to share profits as repayment of a debt or as interest on a loan. The premium for the surety bond, as found above, was separate from the right to receive a share of the profits. Also, the right to be reimbursed for payments made to GMAC was separate from the right to receive a share of the profits. *Id.* at art. 6132b–2.03(b). Even if a reviewing court held that Zurich did not agree to share the losses of SLP's business, Lain has still met his burden of proof of establishing that a partnership had been created. *Id.* at art. 6132b–2.03(c). As a partner in the SLP business, Zurich is liable for SLP's debts. *Id.* at art. 6132b–3.04. If the court applied Texas law, the court would enter a declaratory judgment for Lain.

### Public Policy Considerations

In the event of an appeal, this court invites the appellate court to consider public policy regarding the operations of nursing homes. Hass opined that providing nursing home facilities absent a private market would be a government function. In response to questions from the court, Hass further opined that in providing financing for nursing homes, the government, be it local, state or federal, would mandate the payment of operating expenses as a priority.

In the SLP transaction, with Zurich's involvement, the marketplace provided financing. As Hass testified, the market mimicked what the expert would expect the government would do. The market produced a waterfall contractual agreement that compelled the payment of operating expenses as a priority. Hass further testified that the waterfall is a model for a credit enhancement financial transaction. As a matter of public policy, the parties to that agreement should be bound to pay those expenses.

### Counterclaims

Zurich asserted three counterclaims: (1) a counter declaration that Zurich has no liability to SLP's creditors as a de facto partner; (2) a claim for recoupment; and (3) a claim for setoff. Based on the court's findings of fact and conclusions of law on Lain's claim for a declaration that Zurich has liability as a de facto partner, Zurich's first counterclaim will be dismissed.

With regard to the setoff and recoupment counterclaims, Lain initially moved to dismiss the claims, under Fed.R.Civ.P. 12(b), made applicable by Bankruptcy Rule 7012, for failure to state a claim for relief. Then, at the close of Zurich's evidence, Lain moved for judgment under Fed. R.Civ.P. 52(c), made applicable by Bankruptcy Rule 7052(c). The court carried both motions for consideration.

Considering the four corners of Lain's complaint and Zurich's answer, affirmative defenses and counterclaims, and recognizing the proof of claim filed by Zurich in the underlying bankruptcy case, the court could not conclude that Zurich could prove no set of facts to support its counterclaims for setoff and recoupment. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Indeed, the court has

recognized that the litigation presents core issues of the allowance of a claim and counterclaim, which gives rise to the possibility of proof of setoff. *See Centre Strategic Invs. Holdings Ltd. v. Official Comm. of Unsecured Creditors of SLP, L.L.C. (In re Senior Living Props., LLC),* 294 B.R. 698, 701–02 (Bankr.N.D.Tex.2003). The Rule 12(b)(6) motion is denied.

With regard to the Rule 52(c) motion, the court considers the motion for judgment in the context of all the evidence presented at trial.

■ For setoff, Illinois case law requires that (1) the debtor must owe a debt to the creditor that arose pre-petition; (2) the debtor must have a claim against the creditor that arose pre-petition; (3) the claim and the debt must be mutual; and (4) the claim and the debt must each be valid and enforceable. *In re St. Francis Physician Network, Inc.,* 213 B.R. 710, 715 (Bankr.N.D.Ill.1997); *In re Lakeside Cmty. Hosp., Inc.,* 151 B.R. 887, 891 (N.D.Ill.1993).

Under the Reimbursement Agreement, as found above, SLP had a pre-petition obligation to pay Zurich for all payments made to GMAC and/or Heller pursuant to the surety bonds issued by Zurich for the benefit of GMAC and Heller.

Also, as found above, under the Reimbursement Agreement and Illinois law, SLP had a pre-petition claim against Zurich for payment of SLP's creditors.

■ Contrary to Lain's arguments, the claim and the debt are mutual. Mutuality means that the "debts must be in the same right and between the same parties, standing in the same capacity and same kind or quality." *Lakeside,* 151 B.R. at 891. "The parties must have full and concurrent rights against each other." *Id.* Lain alleges a claim owned by SLP against Zurich. *See Centre,* 294 B.R. at 702. Lain does not allege claims belonging to individual creditors of SLP. Lain asserts that under Illinois partnership law, Zurich had been a partner of SLP in SLP's business. Consequently, Zurich owes SLP for unpaid pre-petition obligations.

Lain intends to file a subsequent adversary proceeding to determine the extent of Zurich's liability to SLP. However, at the trial of this adversary proceeding, Lain suggested that Zurich owes SLP $421 million to cover all of SLP's pre-petition debt. That amount includes the remaining pre-petition obligations owed to GMAC and Heller. The amount also includes Zurich's own pre-petition claim. But Zurich has paid GMAC and Heller pursuant to the surety bonds, and continues to pay GMAC. Although Zurich makes payments to GMAC post-petition, GMAC's claim against SLP and the corresponding obligation of Zurich arose pre-petition. Lain does not contend otherwise.

According to Zurich's proof of claim, Zurich has paid $93,181,419.78 as of the petition date and continues to pay $1,584,576 monthly. If Lain recovers the full amount of SLP's unpaid debt from Zurich, Lain will recover not only the remaining debt owed to GMAC and Heller, but also the amount owed to Zurich pursuant to the Reimbursement Agreement. Lain would have to pay that amount back to Zurich. Mutuality exists. SLP and Zurich have full and concurrent rights against each other.

The claims are valid and enforceable. Lain contends that, in equity, Zurich should not be permitted to exercise its setoff rights. The court disagrees. Zurich has performed its obligations under the surety bonds. Zurich has an allowable claim to recover those payments. Illinois partnership law recognizes that a partner may have a right to payment from the partnership. 805 ILCS 205/18.

Lain also contends that Zurich purchased part of its claim post-petition. Claims purchased by an entity other than the debtor after a bankruptcy petition has been filed may not be setoff under 11 U.S.C. § 553(a)(2)(A). In addition, Zurich has not presented evidence of the specific amount paid by Zurich on the GMAC loan and on the Heller obligations. The court only has the aggregate amount of the claim.

On this record, Zurich has established that it is entitled to a setoff of the amounts paid on the GMAC and Heller loans pursuant to the surety bonds. The court will defer the determination of the amount of the setoff to the subsequent adversary proceeding to be filed by Lain, which adversary proceeding will address the determination of the amount of Zurich's liability to SLP.

For recoupment, the Illinois cases allow a creditor to reduce the amount of the plaintiff's claim by asserting a claim against the plaintiff that arose out of the same transaction. "The transaction upon which the debtor's claim is based must be so closely intertwined with the creditor's claim that the amount of the former cannot be fairly determined without resolving the latter." *In re Clark Retail Enters., Inc.*, 2003 WL 21991624, at *9 (Bankr.N.D.Ill. Aug.18, 2003).

The Reimbursement Agreement establishes that Zurich became a partner of SLP in SLP's business and that Zurich had a right to payment from SLP for payments made by Zurich on the surety bonds. But a single contract does not necessarily resolve the issue of whether there is a single transaction. *Id.* at *11. Illinois partnership law imposes liability on Zurich based on the rights Zurich obtained under the Reimbursement Agreement. Lain's claim is therefore based on the SLP transaction itself. Zurich's proof of claim is premised, in part, on payments made pursuant to the surety bonds, a sub-part of the SLP transaction. Zurich's claim is therefore based on the GMAC loan, SLP's default and Zurich's surety bonds. Lain's claim can be determined without resolving Zurich's claim. Similarly, Zurich's claim can be resolved without resolving Lain's claim. Although a close issue, the court holds that the claims do not arise out of the same transaction. Recoupment therefore does not apply.

The court will dismiss count 2 for recoupment. The court will issue a judgment on count 3 declaring that Zurich has a right to setoff payments made under the surety bond to GMAC and Heller. The court will defer consideration of the amount of the setoff until Lain seeks a money judgment from Zurich in a subsequent adversary proceeding.

*Order*

Based on the foregoing,

**IT IS ORDERED** that Dan B. Lain, the Trustee of the Senior Living Properties L.L.C. Trust, shall have a judgment declaring that ZC Specialty Insurance Company is a partner in the SLP business and, as a partner, is liable for Senior Living Properties' debts.

**IT IS FURTHER ORDERED** that ZC Specialty Insurance Company shall have a judgment declaring that it has a right to setoff payments made under surety bonds for the GMAC and/or Heller debts. The court defers consideration of the amount of the setoff until Lain seeks a money judgment from ZC Specialty Insurance Company based on the above declaration in another adversary proceeding.

**IT IS FURTHER ORDERED** that counts 1 and 2 of ZC Specialty Insurance Company's counterclaim will be dismissed.

272

Counsel for Lain shall submit a proposed final judgment pursuant to this order.